**In re Donald A. KONZAK and Mary A. Konzak, Debtors.**

**Bankruptcy No. 87–05335.**

United States Bankruptcy Court, D. North Dakota.

Sept. 18, 1987.

Leo Broden, Devils Lake, N.D., for debtors.

John Traynor, Devils Lake, N.D., for First Nat. Bank.

Wayne Drewes, Fargo, N.D., trustee.

Douglas Christensen, Grand Forks, N.D., for Farm Credit Services.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

Before the court for confirmation is the Debtors' First Modified Chapter 12 Plan Of Reorganization filed August 10, 1987. The

confirmation hearing was held on August 17, 1987.

As presently constituted the plan proposes to fully pay in deferred cash payments, all impaired secured claims including those of the Federal Land Bank (FLB) and the First National Bank of Devils Lake without regard to the value of such creditors' interest in the collateral securing such claim. By virtue of such treatment there are no unsecured claims. The First National Bank, while objecting to the treatment afforded it in the original plan is essentially satisfied by the present treatment which proposes to pay the remaining indebtedness of $121,774.23 over ten years at 10.25% interest. Although it too is being fully paid off, FLB objects to the repayment of $161,553.62 over thirty years at a fixed rate of interest of 9.75%. It also suggests that it is not receiving what it would be if the estate were liquidated and finally it questions whether the plan is ultimately feasible.

### 1.

The Debtor, Donald Konzak, premises the plan rate of interest of 9.75% on a survey he made of interest rates being paid in various markets by farm borrowers as reflected in a newspaper article. He also relied upon rates available to participants in the Farm Credit Services Land Values Guarantee Program. A senior special credit officer, testifying on behalf of FLB, said that it offers a three-tiered lending rate. Tier I, constituting the best rates, range from a one year variable rate of 9.75% to a five year fixed rate 10.25%. Tier II ranges from a 10.85% one year variable rate to a 11.5% five year fixed rate. Tier III ranges from a 12% variable to a 12.5% five year fixed rate. None of the tiered rates are fixed for a period longer than five years and Tiers I and II require a better debt-to-asset ratio than the Debtors which is 64%. According to FLB's officer, the best rate the Debtors would qualify for in 'the present circumstances is 12%.

Section 1225(a)(5)(B)(ii) requires that a secured creditor who is being paid over time receive the present value of its claim. When being paid over time in de-

ferred installments, the interest rate or discount rate used must be a rate which will insure the present value. Most courts, including this one, looking at the issue of appropriate discount rate, have adopted a creditor—specific market rate approach. *In re Edwardson,* 74 B.R. 831 (Bankr.D.N. D.1987); *In re Citrowske,* 72 B.R. 613 (Bankr.D.Minn.1987). In adopting this approach reliance is placed on the Eighth Circuit cases of *In re Monnier Brothers,* 755 F.2d 1336 (8th Cir.1985) and *United States v. Neal Pharmacal Co.,* 789 F.2d 1283 (8th Cir.1986). In *Neal* the court held:

"The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payment. With due consideration for the quality of the security and the risk of subsequent default. *Neal,* 789 F.2d at 1285.

Generally, the best evidence of what a reasonable discount rate is for a given principal, term and risk, is the rate the creditor involved would charge the debtor for such a loan in the marketplace absent the event of bankruptcy. Although the risk of nonpayment may be somewhat reduced in a Chapter 12 case due to the debtor's ability to shed unsecured debt, it is by no means completely eliminated. From the testimony presented, even the Debtors themselves agree that the marketplace does not offer a 9.25% thirty year fixed rate. Rates being made available to participants in special land disposal programs are not reflective of the market for a thirty year fixed loan. Property being sold under the Land Value Guarantee Program is sold at approximately 10% above market value and requires a minimum down payment of 20%. The interest rate available is 9% amortized over twenty-five years but with a seven year balloon required. Clearly, this is a dramatically different term than what is being proposed in the Debtors' modified plan. A 9.25% rate of interest fixed for thirty years is not reflective of the present market rate for a thirty year loan. Indeed, even a 12%

fixed rate is available only for five years. Nonetheless, the 12% rate more closely approximates what the prevailing market rate is and if the debtor wishes to adhere to a fixed thirty year rate, it should be 12%.

### 2.

■ Normally, under section 1225(a)(5) a secured creditor's claim is written down to the extent of the value of its interest in the collateral with the balance of its claim accorded unsecured treatment. In the instant case, the value of the land mortgaged to FLB is $82,000.00 which would leave $79,553.00 entitled to treatment as an unsecured debt. However, because the Debtors have not, as is their right under section 506(a), chosen to pay the claim only to the extent of the value of FLB's interest in the property, they need not be concerned about whether FLB is being accorded appropriate treatment for what would otherwise be an unsecured claim.

### 3.

■ Plan feasibility as a confirmation standard in the context of Chapter 12 cases springs from section 1225(a)(6) which provides:

> "The debtor will be able to make all payments under the plan and comply with the plan."

The concept of feasibility contemplates "The probability of actual performance of the provisions of the plan". *In re Clarkson*, 767 F.2d 417 (8th Cir.1985). This court endeavors to give a Chapter 12 debtor the benefit of the doubt on the issue of feasibility providing "it appears reasonably probable that the farmer can pay the restructured secured debt over a reasonable period of time, at a reasonable rate of interest, in light of farm prices and farm programs as of the date of confirmation". *In re Ahlers*, 794 F.2d 388, 392 (8th Cir. 1986).

The Debtors operate a diversified livestock and farming operation on 1,930 acres situated in Ramsey County, North Dakota. They have livestock presently consisting of approximately 55 cow—calf pairs, 27 yearlings, 7 steers and 3 dry cows, all having a value of approximately $54,800.00. They also have a complete line of farm equipment available to them worth $131,615.00. The livestock and machinery are subject to security interests in favor of the First National Bank and Massey Ferguson. FLB holds a first mortgage on 430.6 acres of the farmland worth approximately $80,000.00. In addition to feed grain production consumed in the operation, the Debtors anticipate cash grain income of $93,076.00 in 1987–88 and livestock income of $23,475.00 derived from the sale of 51 head of yearling feeders and culls. The plan projects wheat and barley yields above what the ASCS established farm yields are. The ASCS yield figures are 27 bu./acre for wheat and 40 bu./acre for barley, yet future income projections are based on wheat yields of 30–38 bushels per acre and barley yields of 45 bushels per acre. Total 1987–88 income is projected to be $116,551.00. Projected expenses, including personal living, for this period total $73,232.00 leaving $43,318.00 available for plan payments in 1987–88. For each of the succeeding two years, the cash crop income increases to $103,065.00 due to projected increased sunflower and buckwheat acreage, less feed grain acreage and projected higher market prices for all cash crops. Income from livestock sales is anticipated to be $21,-250.00, again derived from the sale of feeders and culls. Total income is projected at $124,315.00 for each of the succeeding years. Expenses for these later years are projected at $80,996.00 leaving available for plan payments the sum of $43,318.00 each year. As presently constituted, the plan requires payments each year of $43,-318.00 inclusive of a trustee's fee of $3,938.00, FLB payment of $16,782.00, First National Bank payment of $20,031.00, and Massey Ferguson payment of $2,566.00.

The standing Chapter 12 trustee recommends confirmation, however, it is apparent that even if the Debtors' projections are to be accepted, the margin for error is absolutely nonexistent. No evidence was presented on how future yields would consistently out perform the established yield figures. There was also no evidence pro-

duced establishing the heightened grain market prices ascribed to the future years production. If the ASCS yield figures for wheat and barley are used for 1987–88, the Debtors' crop income falls to $84,612.00 rather than the projected $93,076.00 and the net amount available for debt retirement in 1987–88 becomes $34,854.00. If the 1987–88 market prices for durum, barley and sunflowers are injected into the Debtors' plan projections, the crop income for the succeeding years falls to $97,350.00, reducing the amount available for debt retirement to $37,603.00. If ASCS yield figures for wheat and barley are factored in as well, then the crop income in succeeding years falls from the projected $103,065.00 to $92,830.00 reducing the amount available for debt retirement to $33,083.00.

A debtor should not premise future plan cash flows upon heightened yield or market data for successive plan years unless there is some objective base for such data. The plan must, to the extent possible, be based on known inputs including yields, farm prices and programs as presently existing. No one can predict what prices will be in the future and it is folly to peg feasibility upon future yields and market prices which are at best often unpredictable and at worst even imaginary. This is particularly true where, as here, there is absolutely no margin of error built in for even minimal unforeseen expenses or reduced yields.

While this court will give a debtor the benefit of the doubt and will accept testimony bearing on the issue of what might be reasonably expected to happen to crop yields and grain prices in the future, such testimony should be based upon historical production figures, county averages, or ASCS proven yields. Market projections must be supported by some factual basis in order for them to be regarded by the court as anything more than wishful thinking. *In re Anderson*, 52 B.R. 159 (Bankr.D.N.D. 1985). The determination of feasibility, even in Chapter 12 cases, cannot be made in a complete evidentiary vacuum but, as stated by the Eighth Circuit, "must be rooted in predictions based upon objective fact." *In re Clarkson*, 767 F.2d 417, 420 (8th Cir.1985); *see also, In re Hoff*, 54 B.R. 746 (Bankr.D.N.D.1985). The Debtors have failed to supply this court with sufficient information to allow a valid assessment of whether their future yield and income projections are within the realm of probability. Consequently, the court is unable to state as a matter of fact that the Debtors have the ability to make all payments under the plan.

The ability of the plan to cash flow becomes even more of a problem when the discount rate of 12% is employed for calculating the annual payments due FLB. The annual payment to FLB becomes $20,055.86 which correspondingly increases total plan payments to $46,920.02. Even when accepting as correct the Debtors' future crop income projections, the result is an annual cash shortfall of $3,602.02. When using 1987–88 market data for the succeeding years, this shortfall is increased to $9,317.00 and when ASCS yields are factored in, the shortfall becomes $13,837.00 in succeeding years.

The plan under consideration is not feasible in view of the facts above outlined and under the criteria which must be followed in these cases.

Accordingly, confirmation of the Debtors' First Modified Plan is DENIED.

SO ORDERED.