In re Gilmore Robert GRESETH and Carol Ann Greseth, Debtors.

Gilmore Robert GRESETH and Carol Ann Greseth, Appellants,

v.

FEDERAL LAND BANK OF ST. PAUL; Federal Land Bank Association of Willmar; William Westphal, United States Trustee; Mark C. Halverson, Chapter 12 Standing Trustee; and U.S. Department of Agriculture, Agricultural Stabilization and Conservation Service (ASCS), Appellees.

The FEDERAL LAND BANK ASSOCIATION OF WILLMAR (ST. PAUL), Appellant,

v.

The AGRICULTURAL STABILIZATION AND CONSERVATION SERVICE (ASCS), Appellee and Cross–Appellant,

Gilmore Robert Greseth and Carol Ann Greseth, Appellees.

Bankruptcy No. 4–86–3722(K).

Civ. Nos. 4–87–642, 4–87–650.

United States District Court,
D. Minnesota,
Fourth Division.

Oct. 16, 1987.

Kurt M. Anderson, Balyk & Anderson, St. Paul, Minn., for Gilmore Greseth and Carol Greseth.

Leah R. Bussell, Gislason, Dosland, Hunter & Malecki, New Ulm, Minn., for Federal Land Bank Ass'n of Willmar.

Mark H. Weber, Minneapolis, Minn., for U.S. Trustee.

Mark C. Halverson, Mankato, Minn., for Chapter 12 Standing Trustee.

Jerome G. Arnold, U.S. Atty., and Elissa G. Mautner, Asst. U.S. Atty., Minneapolis, Minn., for Agr. Stabilization and Conservation Service.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on debtors' appeal of the bankruptcy court's order denying confirmation of their April 14, 1987 plan and creditor's appeal of the bankruptcy court's order confirming debtors' May 26, 1987 plan.

### FACTS

Debtors are farmers seeking to reorganize under chapter 12 of the bankruptcy code. The Federal Land Bank (FLB) and the Agricultural Stabilization and Conservation Service (ADCS) are creditors whose interest is affected by debtors' bankruptcy proceeding. The U.S. Trustee and the Chapter 12 Standing Trustee are officials responsible for administering chapter 12 bankruptcy proceedings.

The debtors filed their chapter 12 bankruptcy petition on December 11, 1986. On March 11, 1987 they filed a plan of reorganization which was subsequently amended, and which provided that delinquent real estate taxes would be paid directly by the debtors and would not be subject to the trustee's statutory percentage fee. The plan also provided that administrative expenses similarly would be exempt from the trustee's statutory fee. Although prior to filing debtors were indebted to the Agricultural Stabilization and Conservation Service (ASCS) for various deficiency payments, the plan treated ASCS as an unsecured creditor and provided that debtors would receive all conservation reserve program (CRP) payments owed them by ASCS from 1987 to 1995 without offset. Various parties objected to these provisions. At a hearing on April 14, 1987 the bankruptcy court orally held that the real estate taxes and administrative expenses are subject to the trustee's fee. Hearing Transcript at 4–5. Subsequently, debtors modified their plan to allow for payment of the trustee's fee on the real estate taxes and administrative payments. However, based on debtors' failure to provide for offsets by ASCS and other objections, the bankruptcy court

denied confirmation of the April 14, 1987 plan by written order dated May 1, 1987.

Debtors again amended their plan to provide for the ASCS offset over the period of the plan. Their final amended plan, dated May 26, 1987, further provided that a portion of debtors' Federal Land Bank (FLB) stock would be surrendered to FLB, leaving debtors as the holders of the required percentage of stock based on FLB's allowed claim under the plan. On May 27, 1987, the bankruptcy court entered an order confirming debtors' modified chapter 12 plan dated May 26, 1987.

Debtors now appeal the bankruptcy court's May 1, 1987 order denying confirmation of their April 14, 1987 plan. Creditors ASCS and FLB oppose this appeal and cross appeal the bankruptcy court's confirmation order of May 27, 1987. Jurisdiction for these appeals is proper under 28 U.S.C. § 158(a).

## DISCUSSION

### I. Debtors' Appeal of Order Denying Confirmation of April 14, 1987 Plan.

#### A. Delinquent Tax Payments

In order to obtain protection from creditors and effect a reorganization of farming operations, a chapter 12 debtor must comply with the plan requirements of 11 U.S.C. §§ 1221, 1222. Under section 1222, the debtor must formulate a plan which provides for the debtor to turn over large portions of the debtor's annual income to be paid to creditors based on statutory priority. *See* 11 U.S.C. § 1222(a)(1), (2). The person responsible for receiving the

debtor's income and making proper payments to creditors is the chapter 12 standing trustee. *See* 11 U.S.C. §§ 1222(a)(1), 1226. The standing trustee oversees the implementation of the debtor's plan and insures that the plan is properly carried out. *See* 11 U.S.C. § 1202.

Title 28 U.S.C. § 586(e)(1)(B) establishes a mechanism for compensating standing trustees under chapter 12. Section 586(e)(1)(B) provides for a percentage fee to be charged on all payments made under a plan of reorganization.[1] This percentage fee operates as a surcharge which a debtor must pay to obtain the benefits of chapter 12, and compensates the standing trustee for assuming a supervisory role.

In the case at bar, appellant debtors seek to avoid paying the trustee's statutory percentage fee on payments made to the Lac qui Parle County Treasurer for delinquent real estate taxes. The property on which the taxes are due was sold by the county at a tax sale in 1986 before debtors filed their chapter 12 case. Minn.Stat. § 281.17 provides for a five-year redemption period within which debtors may pay the taxes and redeem the land. Debtors argue that payments made to the county to redeem the land from the prepetition tax sale are outside the plan of reorganization and exempt from the trustee's fee. Debtors contend that they do not need chapter 12 protection in order to redeem the land because state law provides an adequate redemption period. They argue that because the tax debt is neither impaired nor restructured under the terms of the plan, the debt is

---

1. 28 U.S.C. § 586(e) provides in part:

(1) The Attorney General, after consultation with a United States trustee that has appointed an individual under subsection (b) of this section to serve as standing trustee in cases under chapter 12 or 13 of title 11, shall fix—

(A) a maximum annual compensation for such individual, not to exceed the annual rate of basic pay in effect for step 1 of grade GS–16 of the General Schedule prescribed under section 5332 of title 5; and

(B) a percentage fee not to exceed—

(i) in the case of a debtor who is not a family farmer, ten percent; or

(ii) in the case of a debtor who is a family farmer, the sum of—

(I) not to exceed ten percent of the payments made under the plan of such debtor, with respect to payments in an aggregate amount not to exceed $450,000; and

(II) three percent of payments made under the plan of such debtor, with respect to payments made after the aggregate amount of payments made under the plan exceeds $450,000;

based on such maximum annual compensation and the actual, necessary expenses incurred by such individual as standing trustee.

(2) Such individual shall collect such percentage fee from all payments received by such individual under plans in the cases under chapter 12 or 13 of title 11 for which such individual serves as standing trustee....

outside the plan's coverage and outside the bankruptcy court's jurisdiction. As a result, debtors argue that no fee is due the trustee for administration of the tax debt.

■ Neither chapter 12 nor section 586(e) contemplates payments being made outside the plan. *See In re Hildebrandt,* 79 B.R. 427, 428 (Bankr.D.Minn.1987). Title 11 U.S.C. § 1222(a) provides that "[t]he plan shall ... provide for the submission of all or such portion of future earnings ... to the supervision and control of the trustee as is necessary for the execution of the plan ..." and indicates that the plan of reorganization should encompass all indebtedness and deal comprehensively with the debtor's credit problems. Further, trustees' salaries are dependent on fees as a percentage of payments. *See* 28 U.S.C. § 586(e). Thus, if a substantial number of payments are made outside the plan, Congress' mechanism of compensating trustees would be thwarted. In keeping with this statutory scheme which encourages an all-inclusive definition of what payments are "under the plan," courts interpreting chapter 12 have narrowly limited the circumstances in which a payment may be made outside the plan and exempted from the trustee's percentage fee. For example, the United States Bankruptcy Court for the District of Minnesota held in *In re Citrowske,* 72 B.R. 613, 615–16 (Bankr.D. Minn.1987) that "[w]ith the possible exception of unaltered regular contractual payments on long term debts, which are much the same as other regular current monthly expenses, all payments to creditors or administrative expense claimants are paid under the plan and thus subject to the trustee's percentage fee." *See also In re Hagensick,* 73 B.R. 710 (Bankr.N.D.Ia.1987); *In re Hildebrandt,* 79 B.R. 427 (Bankr.D. Minn.1987). Courts interpreting chapter 13, after which chapter 12 was closely modeled, similarly have defined narrowly the circumstances under which a payment may be exempted from the trustee's fee. *See In re Foster,* 670 F.2d 478 (5th Cir.1982); *In re Glasper,* 28 B.R. 6 (9th Cir. BAP 1983); *In re Mascari,* 70 B.R. 325 (Bankr.N.D.N.Y. 1987); *In re Hankins,* 62 B.R. 831 (Bankr. W.D.Va.1986); *In re Tartaglia,* 61 B.R. 439 (Bankr.D.R.I.1986); *In re Case,* 11 B.R. 843 (Bankr.D.Utah 1981); *In re Hines,* 7 B.R. 415 (Bankr.D.S.D.1980); *In re Centineo,* 4 B.R. 654 (Bankr.D.Neb.1980); *In re Blevins,* 1 B.R. 442 (Bankr.S.D.Ohio 1979).

■ In their brief, debtors focus on the fact that the tax debt is not impaired by the chapter 12 proceeding nor restructured according to the terms of the plan. They argue that the tax debt is thus outside the plan and not subject to the statutory fee. Debtors ignore, however, the fact that without the protection of a chapter 12 proceeding, they likely would be unable to effectively redeem the property. Thus, while the chapter 12 plan does not impair or restructure the tax debt, the plan does make it possible for the debtors to apply necessary funds to the redemption. In this way the debtors clearly invoke the bankruptcy court's jurisdiction and protection regarding the tax debt and the debt is thus under the plan and subject to the trustee's fee. *See In re Hildebrandt,* 79 B.R. 427, 429. Further, merely because the tax debt is not restructured does not relieve the trustee of his duty to monitor payments. The plan covers payment of mortgagors of the property whose interest in the collateral land must be guarded by the trustee. If the taxes remain unpaid, title may vest in the state and prevent the mortgagors from realizing their investment. The trustee therefore must supervise the repayment of the delinquent taxes. Accordingly, the trustee is deserving of compensation and should receive his statutory percentage of the delinquent real estate tax payment.

**B. Administrative Expenses**

■ The debtors further contend that administrative payments made under the plan should be exempt from the trustee's fee. They argue that charging the fee results in a compounding of administrative expenses that unnecessarily burdens them. Debtors' only support for this argument is the bare provision in 11 U.S.C. § 1222(a)(2) that allows priority claims under 11 U.S.C.

§ 507 to be paid in deferred cash payments. Debtors argue that this payment deferral evidences a congressional intent to exempt administrative expenses from the trustee's percentage fee. No legislative history exists to support debtors' interpretation of congressional intent. On the contrary, reading section 1222(a)(2) in the context of the entire chapter 12 scheme, the Court reaches the opposite conclusion as to congressional intent, *i.e.*, that Congress intended administrative payments to be subject to the trustee's fee.

Section 1222(a)(2) states that a chapter 12 plan shall "provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507 of this title...." 11 U.S.C. § 1222(a)(2). Section 507(a)(1) awards administrative expenses top priority for payments from a debtor's assets. 11 U.S.C. § 507(a)(1). The trustee assumes the responsibility under chapter 12 of monitoring payments under the plan. *See* 11 U.S.C. §§ 1202(b)(4), 1226(c). Further, the trustee is required to pay administrative claims prior to or at the time other creditors are paid under the plan. 11 U.S.C. § 1226(b). This statutory scheme places great importance on payment of administrative claims and requires significant attention to those claims by the standing trustee. As such the Court finds it proper to require the debtor to pay the trustee's fee with regard to administrative payments. This result is supported by *In re Citrowske*, 72 B.R. 613, 616 (Bankr.D.Minn. 1987), where the court held that absent exigent circumstances "all payments to ... administrative expense claimants are ... subject to the trustee's percentage fee." Also, as stated in *In re Hildebrandt*, 79 B.R. 427, 429.

> A chapter 12 debtor knows the statutory scheme of chapter 12 before filing a petition under it. Therefore, the chapter 12 debtor knows that a fee will be required to be paid in order to avail itself of the protections of chapter 12.

Requiring debtors to pay the trustee's percentage fee on administrative expenses does not unnecessarily compound administrative expenses but rather compensates both providers of professional services and the standing trustee for their separate duties. The Court therefore finds that requiring debtors to pay the statutory trustee's fees comports with the statutory scheme and does not unduly burden debtors.

**C. Conservation Reserve Program Payments**

Six months prior to filing their petition, debtors enrolled in the Conservation Reserve Program (CRP). Under the CRP, debtors receive yearly payments from ASCS in return for implementing a conservation plan. *See* 7 C.F.R. §§ 704.12, 704.-13. Also prior to filing, debtors were indebted to ASCS for various deficiency payments. In their April 14, 1987 plan, debtors listed ASCS as an unsecured creditor with regard to this indebtedness. In its order dated May 1, 1987, the bankruptcy court denied confirmation of debtors' plan, holding that ASCS was entitled to a setoff for its CRP payments and ordering that ASCS should be treated as a secured creditor in the amount of the setoff. Order at 4–5. Debtors appeal this holding.

Title 11 U.S.C. § 553(a) allows a creditor "to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against debtor that arose before the commencement of the case." Thus a creditor may offset debts that are mutual and prepetition. *Michigan Consolidated Gas Co. v. Fred Sanders Co. (In re Fred Sanders Co.)*, 33 B.R. 310, 311 (Bankr.E.D.Mich. 1983). Debtors argue that, because their CRP contract requires them to actively comply with its terms for ten years in order to continue receiving payments, the right to receive the payments arises postpetition. Debtors assert that if they fail to comply with program requirements at any time, they must refund all payments received. Debtors thus argue that ASCS may not offset the payments since they do not relate to a prepetition claim. Appellees endorse the bankruptcy court's holding, and contend that the benefits of the CRP

contract accrued to debtors when they entered into the contract.

*Moratzka v. United States Agricultural Stabilization and Conservation Service (In re Matthieson),* 63 B.R. 56 (D.Minn. 1986) controls the result in the case at bar. In *Moratzka,* debtors enrolled in the Federal Crop Deficiency Program which provided payments to debtors based on end-of-the-year market prices in exchange for debtors' promises to refrain from planting crops on certain acreage and to maintain soil conservation practices on unused acreage. Prior to filing their bankruptcy petitions, debtors each had an outstanding debt owing to the government. The question before the court was whether the payments owing debtors under the federal program represented a prepetition claim subject to offset by the government. Debtors in *Moratzka* argued that, because they had to satisfy several conditions postpetition in order to qualify for the payments, and because the payment amount could not be determined prepetition, the government's obligation occurred postpetition and thus could not be offset. The court in *Moratzka* ruled that the federal payments represented a prepetition obligation allowing offset. *Moratzka,* 63 B.R. at 60. The court held that mutual obligations were created prepetition when the contract was formed. *Id.* The court further held that the fact that debtors could be assessed liquidated damages for failing to fulfill contractual conditions postpetition did not prevent setoff. *Id.*

In the case at bar debtors argue that the facts in *Moratzka* were substantially distinct from those present here. Debtors characterize the compliance duties of the debtors in *Moratzka* as minimal in comparison to their ten-year commitment to anti-erosion procedures. As suggested by appellees, this is a distinction without a difference. Regardless of the length of the contract, the parties assumed similar obligations[2] which were determined prepetition at the time the parties formed the

contract. Debtors also argue that *Moratzka* is inapplicable because it involved chapter 7 petitions and did not deal with a reorganization. Citing *Walat Farms, Inc. v. United States,* 69 B.R. 529, 531–32 (Bankr.E.D.Mich.1987), debtors contend that the *Moratzka* contract was necessarily prepetition because it was rejected by operation of law and rejected executory contracts are deemed to be prepetition claims. The court in *Moratzka,* however, did not rely on that reasoning in finding the obligations to be prepetition. On the contrary, the court specifically held that the contract created mutual obligations that bound the parties at the time the contract was formed. *Moratzka,* 63 B.R. at 60. So too in the case at bar the parties assumed mutually enforceable obligations *prepetition.* Therefore, the CRP payments are subject to offset pursuant to 11 U.S.C. § 553(a).

Based on the foregoing, the May 1, 1987 order of the bankruptcy court denying confirmation of debtors' April 14, 1987 plan is affirmed.

## II. Creditors' Appeal of Order Confirming Debtors' May 26, 1987 Plan

### A. Surrender of Federal Land Bank Stock

■ Title 11 U.S.C. § 1225(a)(3) provides that the Court shall confirm a plan if "the plan has been proposed in good faith and not by any means forbidden by law." Appellant Federal Land Bank (FLB) argues that debtors' May 26, 1987 plan should not have been confirmed because it conflicts with other federal law, specifically the Farm Credit Act and other related federal regulations. Debtors' confirmed plan provides for debtors to surrender a portion of their FLB stock, retaining the required percentage that relates to FLB's allowed claim.[3] Title 12 U.S.C. § 2034(a) provides that:

---

2. In *Moratzka,* debtors agreed to set aside certain acreage and employ conservation techniques. *Moratzka,* 63 B.R. at 59.

3. Debtors are required to maintain stock with a value of five percent of their outstanding loan

balance. The amount of the loan allowed by the bankruptcy court was $76,400. Thus debtors' plan provided that debtors retain $3,820 in stock and surrender the remainder. Debtors' Modified Plan dated May 26, 1987.

Stock shall be retired and paid at book value not to exceed par, as determined by the association, upon the full repayment of the loan and if the loan is in default may be cancelled for application on the loan, or under other circumstances, for other disposition, when approved by the [land] bank....

Similarly, 12 C.F.R. § 615.5260 provides that "[i]n case of liquidation or dissolution of a present or former borrower, the bank *may, but shall not be required to,* retire and cancel ... all or part of the capital stock ... owned by or allocated to such borrower." (Emphasis added.) FLB argues that the plan confirmed by the bankruptcy court, which requires surrender of part of the FLB stock owned by debtors, conflicts with the above-quoted provisions and thus is ineligible for confirmation. FLB further argues that if the confirmed plan is upheld, the entire federal farm credit program will be endangered as the stock held by debtors here, as well as stock owned by other FLB member borrowers, provides essential capital to the credit program. FLB thus argues that if all debtors are allowed to force retirement of their FLB stock, FLB will be unable to continue operating and providing agricultural credit.

Title 11 U.S.C. § 1225(a)(5)(C) specifically allows a chapter 12 debtor to surrender property securing a claim as part of a confirmed plan. Similarly, under 11 U.S.C. § 1222(b)(8), a debtor may "provide for the sale of all or any part of the property of the estate or the distribution of all or any part of the property of the estate among those having an interest in such property." These provisions, and chapter 12 as a whole, are "designed to give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land." H.R.Rep. No. 99–958, 99th Cong., 2d Sess. 48, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5227, 5249. The provisions allow farmers to simplify their financial structure, scale down their operations, and deal effectively with the economic hardships of modern farming. If the Court refused to allow the surrender of FLB stock, the Court would frustrate the intent of Congress to rehabilitate family farmers.

Two recent Supreme Court cases support such a broad construction of the bankruptcy code to benefit debtors. In the first case, *N.L.R.B. v. Bildisco*, 465 U.S. 513, 534, 104 S.Ct. 1188, 1200, 79 L.Ed.2d 482 (1984), the Court held that a chapter 11 debtor may unilaterally reject a collective bargaining agreement despite provisions of the National Labor Relations Act which prohibit such action. The Court in *Bildisco* thus upheld the broad fresh start protection of the bankruptcy code against a contrary federal law and policy. In another case, *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 710–11, 83 L.Ed.2d 649 (1985), the Supreme Court held that a debtor may obtain discharge in bankruptcy of an obligation to clean up a hazardous waste site. These cases suggest that even in the face of strong contrary federal policies a court should broadly construe the rights of a debtor in bankruptcy. Certainly, the federal interest in maintaining a viable farm credit program present in the case at bar is no stronger than the governmental interest in protecting workers from unfair labor practices or protecting citizens from the health risks associated with hazardous waste. In fact, it is doubtful that a decision by the Court to allow surrender of the stock would bring dire consequences to the FLB. By the terms of debtors' confirmed May 26, 1987 plan, the required percentage of stock on the allowed loans remains intact. Thus the stock surrendered relates only to the portion of the loan that is written off due in large part to the reduced value of debtors' land. It appears that the negative effects felt by the FLB in reality relate more to falling land and commodity prices than to mass surrender of stock. The federal interest in maintaining the farm credit program thus is substantially outweighed by Congress' intent to aid family farmers through chapter 12.

The only case to consider this issue, *In re Massengill*, 73 B.R. 1008 (Bankr.E.D.N.C. 1987), reached a similar result. In *Massengill*, debtors sought to reduce their obligation to the FLB in part by surrendering their FLB stock. The court approved the surrender, holding that the legislative in-

tent surrounding chapter 12 required that farmer debtors have flexibility to deal with their financial crises. *Massengill*, 73 B.R. at 1012. The court stated that surrendering the FLB stock was a proper method for exercising this flexibility, and held that the Farm Credit Act should not frustrate debtors' ability to so reduce secured claims. *Id.* In the case at bar as in *Massengill*, debtors would be hindered in their attempt to reorganize if they are not allowed to retire their FLB stock. The Court thus finds that the bankruptcy court properly approved surrender of the FLB stock.

### B. Timeliness of the Plan

FLB further argues on appeal that debtors' plan was not confirmable because it was untimely. Title 11 U.S.C. § 1221 requires that "[t]he debtor shall file a plan not later than 90 days after the order for relief under this chapter, except that the court may extend such period if an extension is substantially justified." Upon proposal of a plan, 11 U.S.C. § 1224 requires that "[e]xcept for cause, the [confirmation] hearing shall be concluded not later than 45 days after the filing of the plan." Debtors originally filed their chapter 12 case on December 11, 1986. Ninety days later on March 11, 1987 debtors filed their proposed chapter 12 plan. After several modifications, this plan as amended was considered by the bankruptcy court at a confirmation hearing on April 27, 1987, forty-five days after the plan was filed. As a result of that hearing, confirmation of the plan was denied. Debtors again modified their plan and the bankruptcy court confirmed that modified plan following a May 26, 1987 hearing. FLB argues that all modifications occurring after March 11, 1987, and the confirmation hearing held May 26, 1987, are beyond the statutory deadlines

and contrary to law thus rendering debtors' plan unconfirmable.

The bankruptcy code appears to contemplate modifications of a debtor's plan. Title 11 U.S.C. § 1223(a) provides that "[t]he debtor may modify the plan at any time before confirmation." The code, however, fails to indicate whether such modifications must be accomplished within the ninety-day period set forth by section 1221. Also, while section 1221 allows a debtor an extension of time for filing a plan if "substantially justified," no guidance is provided to indicate when such an extension is warranted. The legislative history of chapter 12 indicates that the ninety-day period was chosen in lieu of a 240–day period to protect creditors from collateral deterioration, and suggests that chapter 12 cases are to be resolved expediently.[4] But nothing in the statute or legislative history provides a definitive answer.

FLB argues that even if a post ninety-day modification is allowed, a debtor must bring a motion asking the court to extend the deadline. FLB relies on 11 U.S.C. § 1208(c)(5) which provides for dismissal of a chapter 12 case upon "denial of confirmation of a plan ... and denial of a request made for additional time for filing another plan or modification of a plan." FLB further relies on *In re Bentson*, 74 B.R. 56 (Bankr.D.Minn.1987) which granted a chapter 12 debtor's motion for an extension of time to file a new plan. FLB contends that debtors never made a motion for an extension and thus did not qualify for more time.

The Court declines to require an affirmative motion in the case at bar for the following reasons. First, while section 1208(c)(5) suggests that some form of motion is required for an extension, it is far from explicit and does not specifically require a motion. Second, while *Bentson*

---

4. Senator Grassley, one of the sponsors of the chapter 12 legislation, stated:

> Earlier versions of this new chapter allowed a farm-debtor 240 days to file a plan. During this time, collateral could deteriorate without the promise a confirmable reorganization plan. To address this problem, the exclusive period has been reduced to 90 days in the conference approved bill.

> If the time limits are not met, the case will be dismissed and cannot be refiled. This will be a powerful incentive to get these cases moving, rather than languishing in the courts....

132 Cong.Rec. S15075–76 (daily ed. Oct. 3, 1986) (statement of Sen. Grassley).

involved an extension based a motion, it did not hold that a motion is required. *Bentson*, 74 B.R. at 58. Rather, the court in *Bentson* merely said that a motion is "proper." *Id.* Third, even if the Court held that a motion is necessary, one could persuasively argue that the bankruptcy court implicitly granted debtors' motions for an extension by considering debtors' modified plans.

The legislative history of the section 1224 forty-five day requirement, while it suggests that extensions should be granted sparingly, does not indicate who is to benefit from strict construction of the forty-five day requirement.

> Section 1224 requires that Chapter 12 confirmation hearings be concluded within forty-five days after the filing of the plan. The Conferees are aware that this imposes a burden on the bankruptcy courts. Therefore an exception for cause is provided. While a backlog of cases is sufficient cause for an extension of the forty-five day requirement, the Conferees expect this exception to be used sparingly in order to facilitate the proper operation of Chapter 12—which proper operation depends on prompt action. 132 Cong.Rec. H8998–99 (daily ed. Oct. 2, 1986) (joint explanatory statement of the committee of conference).

One could reasonably conclude that either the chapter 12 debtor or creditor is the intended beneficiary of section 1224 and its insistence on speedy judicial resolution. Further, nothing precludes the Court from concluding that a confirmation hearing is proper if held within forty-five days of the filing of a *modified* plan as in the case at bar.

■ Given the lack of legislative guidance, the Court must decide on its own whether debtors' post-deadline plan modifications and confirmation hearing were sufficiently timely to satisfy chapter 12. The court in *Bentson*, 74 B.R. at 58, faced with a similar task, set forth several criteria for deciding whether to grant an extension. The court in *Bentson* considered: "when the first chapter 12 plan was filed, how comprehensive and complete the first plan

was, the reasons for denial of confirmation of the first plan, [and] the likelihood of successful confirmation of a new plan." *Id.* The bankruptcy court in the case at bar implicitly adopted these criteria. Transcript of May 26, 1987 Confirmation Hearing at 19–20. The court stated that

> the fairest reading of it [chapter 12] is that the Debtors, as long as they filed a plan that was a good faith plan, and the fact that they missed the bull's-eye ... shouldn't preclude them from taking another shot at it.... [M]aybe in an appropriate case where the debtors are just stalling for time where there isn't a real effort being made to move along as quickly as possible, there would be something to that [timeliness] objection.... But in this context, I think that the debtors are entitled to have this plan considered.

*Id.* The bankruptcy court, which is uniquely situated to assess the debtors' effort at compiling a workable plan, thus determined that debtors had done their best to comply with chapter 12 and qualified for an extension. This determination is amply supported by the evidence of debtors' repeated expeditious modifications of their plan to accomplish a workable reorganization. Therefore, the Court finds that the bankruptcy court's findings show that an extension in the case at bar is "substantially justified" under 11 U.S.C. § 1221. Further, given the lack of legislative guidance, the Court finds that the bankruptcy court did not violate 11 U.S.C. § 1224 by confirming debtors' plan through the May 26, 1987 hearing.

## C. Setoff Amount

■ Pursuant to debtors' confirmed plan dated May 26, 1987, ASCS may exercise its right of setoff in installments over the period of the plan. *See* May 26, 1987 Plan. In other words, although debtors owe ASCS more than $33,000 and are to receive a CRP payment of approximately $6,700 every year, the entire $6,700 will not be offset each year until the debt is paid. Instead, a portion of each CRP payment will be offset with the remainder being paid the debtor. ASCS, in a one-paragraph

argument, contends that the planned setoff is not "equitable" because it is dependent on debtors staying in the CRP.

Title 11 U.S.C. § 1225(a) provides in part that the court *shall* confirm a plan if "the value ... of property to be distributed ... under the plan on account of such [secured] claim is not less than the allowed amount of such claim." *See* section 1225(a)(5)(B)(ii). The plan as confirmed allows ASCS its full claim and provides for payment of that claim in full. As such the plan satisfies the statutory requirements and was properly confirmed.

The Court finds no merit in ASCS' half-hearted contention that their collateral is endangered by the scheduled offset payments. Debtors will receive large payments through the CRP in exchange for doing little more than maintaining idle land, and therefore have absolutely no incentive to jeopardize their reorganization by breaching the CRP contract. Clearly, ASCS is adequately protected.

### D. May 26, 1987 Hearing Testimony

 In its final argument on appeal, FLB contends that the bankruptcy court erred in not receiving testimony at the May 26, 1987 hearing concerning the effect of forced retirements of stock on FLB's financial condition. FLB asserts that this testimony would demonstrate the destabilizing effect of member retirements on the federal farm credit program. FLB argues that, had such testimony been allowed, FLB would have established that Congress did not intend chapter 12 to take priority over the Farm Credit Act.

The record does not support FLB's contention. First, while the hearing transcript indicates that FLB was ready to produce a witness to discuss FLB's financial condition, the transcript does not demonstrate that FLB demanded that testimony be received or objected to the witness being excluded. Transcript of May 26, 1987 Confirmation Hearing at 4. Second, the record reflects that counsel for FLB was heard on the subject of stock retirement and presented an argument outlining the financial risk to FLB from forced retirement.

Tránscript at 7–8. Thus the record shows that the bankruptcy court was adequately informed of the consequences of stock surrender so that it could render a decision on legislative intent. Further, from the point of view of the reviewing Court, the Court finds that additional testimony on FLB's financial condition was not necessary in order to resolve the conflict between chapter 12 and the Farm Credit Act.

Based on the foregoing, the May 27, 1987 order of the bankruptcy court confirming debtors' May 26, 1987 plan is affirmed.