### In re Arlon ROTT and Rhodell Rott, Debtors.

### Bankruptcy No. 88–05565.

United States Bankruptcy Court, D. North Dakota.

Oct. 27, 1988.

---

Joseph A. Vogel, Mandan, N.D., for debtors.

Wayne Drewes, Fargo, N.D., trustee.

Kim Anderson, Minneapolis, Minn., for Aetna Life Ins.

Vicki Aldridge, Fargo, N.D., USA/SBA.

### MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matter before the court is confirmation of the Debtors' First Amended Plan under Chapter 12 of the Bankruptcy Code. The Debtors, Arlon and Rhodell Rott, filed the plan on August 10, 1988, and a confirmation hearing was held on September 7, 1988. The Small Business Administration (SBA) and Aetna Life Insurance Corporation (Aetna) have both filed objections to confirmation of the plan.

#### 1.

The Debtors' Chapter 12 plan currently before the court arises from their third bankruptcy filing. The Debtors filed their first petition for relief under Chapter 12 on January 29, 1987, commencing bankruptcy case number 87–05098. On April 20, 1987, the court entered an order denying confirmation of the Rott's First Amended Plan in case 87–05098. Confirmation was denied because the plan did not propose an adequate interest rate to give Aetna the present value of its interest in its collateral as required by section 1225(a)(5)(B). *See In re Rott*, 73 B.R. 366, 374 (Bankr. D.N.D. 1987).

As part of this order the court valued the Debtors' real estate at $463,233.00. In the plans advanced by the Debtors in their first Chapter 12 filing they proposed to transfer all but $315,133.00 worth of the land to Aetna.

On September 23, 1987, the court entered an order denying confirmation of the Debtors' Second Amended Plan in case number 87–05098. In that Order the court concluded that the Second Amended plan was not confirmable because it was not feasible. Case number 87–05098 was dismissed on December 29, 1987.

On February 8, 1988, the Debtors again filed for relief under the Bankruptcy Code, this time under Chapter 11 in case number 88–05100. United States Magistrate Klein dismissed the Chapter 11 filing on June 3, 1988. The Magistrate concluded that there was no reasonable likelihood that the Debtors could rehabilitate their farming operation while complying with the absolute priority rule under Chapter 11. *See In re Rott*, Bankr. No. 88–05100, slip op. at 9 (Bankr. D.N.D. June 3, 1988). The Debtors filed their current Chapter 12 petition on July 11, 1988. In the instant case the Debtors propose to turn over all of their land to Aetna except the parcels designated 3, 4 and 5 with an aggregate value of $267,133.00. Thus, they have reduced their secured debt load from their first Chapter 12 by $48,000.00.

#### 2.

In this case there are several objections to aspects of plan treatment and an objection to the plan's feasibility. The plan treatment objections will be discussed first. The SBA objects to confirmation because the plan provides that unsecured debts will be discharged after only one year. Section 8(b) of the plan provides:

1. All unsecured creditors shall receive a yearly pro-rata payment being a percent of the total claim. The yearly amount, $13,582.17 to be pro-rata to all unsecured creditors. * * * First year only, then discharged.

2. The first payment to all unsecured creditors should commence on 12–31–88 and on the same date each year thereafter for the term of the plan at which time they are discharged.

Section 1228(a) of the Bankruptcy Code provides that the court shall grant a discharge to the debtor "[a]s soon as practicable after completion by the debtor of all payments under the plan, other than payments provided for under section 1222(b)(5) or 1222(b)(10)." The two plan provisions quoted above are contradictory. Paragraph 1 indicates that the unsecured debts will be discharged after the first year. Paragraph 2 appears to provide that the unsecured debts will not be discharged until after all of the payments are made over the term of the plan. The Debtors bear the burden of proving that their plan is confirmable. The plan is a contract between the Debtors and their creditors. It is not a document which may be ambiguous. Section 1225(a)(1) provides that the court shall confirm a plan if it complies with the provisions of Chapter 12. In this case the Debtors have not convinced the court that their plan, as proposed, complies with the discharge provision of section 1228(a).

### 3.

■ The SBA and the Chapter 12 standing trustee have objected that the plan does not commit all of the Debtors' disposable income to the plan. Once again certain of the plan provisions are contradictory. Section 8(b)(1) of the plan provides that the unsecured creditors shall receive a one-time payment of $13,582.17 after the first year of the plan. Alternatively paragraph 15 provides that "all of the Debtors' projected disposable income will be applied to make payments under the plan." While this apparent ambiguity alone could be a basis upon which to deny confirmation, a more serious problem exists with regard to the plan's treatment of the Debtors' disposable income. The expenses projected in a schedule attached to the plan include a line item for "capital improvements." The plan projects a capital improvement expense of $11,917.00 for 1988; $5,763.09 for 1989; and, $6,974.25 for each of the years 1990–91. At the confirmation hearing Debtors' counsel redesignated the item as a "cushion". The purpose advanced for the cushion is to allow for unexpected expenses over the life of the plan. The plan does not specify exactly what potential expenses are to be absorbed by the cushion. Section 1225(b)(1) provides that if an unsecured creditor objects to confirmation a plan may not be confirmed unless the unsecured creditor receives the full amount of its claim or the plan "provides that all of the Debtors' projected disposable income to be received in the three year period ... will be applied to make payments under the plan." While the language of the statute does not specify what type of plan payments are to be made with the disposable income, it is generally accepted that the disposable income is to be used for payments to unsecured creditors. *See In re Citrowske*, 72 B.R. 613, 616 (Bankr.D.Minn.1987); *In re Wobig*, 73 B.R. 292, 295–96 (Bankr.D.Neb. 1987); *In re Janssen Charolais*, 73 B.R. 125, 128 (Bankr.D.Mont.1987). Section 1225(b)(2) defines "disposable income" as income not "reasonably necessary" for the Debtors' maintenance and support or for the "continuation, preservation, and operation of the Debtor's business." The basic test of disposable income is one of reasonableness. *In re Coffman*, 90 B.R. 878 (Bankr.W.D.Tenn.1988). The expenses deducted from income to arrive at disposable income must be reasonable. *See Id.*

Disposable income is a residual amount calculated as follows:

Total income
—Personal living expenses
—Business expenses including cash
—Plan payments (other than to unsecured creditors)
Disposable income available for unsecured creditors

The structure of the Debtors' plan reflects a different calculation than the one set out

above. Section 1225(a)(4) requires that an unsecured creditor in a Chapter 12 reorganization must receive at least as much as it would in a Chapter 7 liquidation. In the Debtors' plan the amount of disposable income is set at a dollar amount equal to the amount the unsecured creditors would receive in a liquidation. The amount is exactly the same as the one calculated on the liquidation analysis attached to the plan. Thus the Debtors' plan rearranges the calculation set out above as follows:

Total income
—Personal living expenses
—Business expenses excluding cushion
—Plan payments (other than to unsecured creditors)
—Disposable income (set at amount unsecured creditors receive upon liquidation).
Cushion

This method of calculating disposable income does not allow the unsecured creditors to benefit if the undesignated expenses to be absorbed by the cushion do not occur. Rather, in that instance, the cushion becomes a windfall for the Debtors. This court has previously noted how difficult it is for Debtors to make accurate projections in the context of a farming operation. *See In re Konzak,* 78 B.R. 990, 994 (Bankr. D.N.D.1987). In *Konzak* the court observed that a margin of error should be built into expense projections to absorb unforeseen expenses. *Id.* This cushion, however, should be built into each individual projection and the Debtors should have a reasonable basis for the existence and amount of the cushion. *See Id.* Thus, for example, if a debtor projects repair expense at 200% of its historical average he should be able to explain at the confirmation hearing that his tractor is old and there is a high probability that it will require major repairs during the next year. An increased expense projection in that situation would be reasonably necessary for the continuation of the Debtors' business.

The amount of disposable income should initially be calculated by the Chapter 12 standing trustee who should review the debtor's financial records, determine what amounts are reasonably necessary for the maintenance and continuation of the debtor's business, and recommend a specific amount for distribution to the unsecured creditors. *In re Schwarz,* 85 B.R. 829, 832 (Bankr. S.D. Iowa 1988); *In re Coffman,* 90 B.R. 878 (Bankr. W.D.Tenn.1988). If the Debtor or an unsecured creditor disagrees with the amount recommended by the trustee they may challenge the distribution under section 1229(a)(1) of the Bankruptcy Code. *Schwarz,* 85 B.R. at 832; *Coffman,* 90 B.R. at 885. In the instant case the court concludes that the Debtors have not committed all of their disposable income to the plan and thus the plan does not meet the requirement of section 1225(b)(1).

4.

 The SBA and Aetna also object to confirmation because the plan does not adequately provide for payment of the trustee's fee. The plan only includes the 10% trustee's fee on the payments to Aetna. Section 586(e)(1)(B)(ii) of United States Code Title 28 provides that the standing trustee in a case under Chapter 12 shall receive compensation "not to exceed 10% of the payments made under the plan of such debtor...." There is presently a split among the courts as to whether a debtor may make payments to an impaired creditor directly and thereby avoid the trustee's fee. *Compare In re Logemann,* 88 B.R. 938 (Bankr. S.D. Iowa 1988) (concluding that trustee's fee must be paid on all impaired claims even if the debtor makes the payment) *with In re Erickson Partnership,* 83 B.R. 725 (D.S.D.1988) (concluding that under certain conditions debtors may avoid trustee's fee by making direct payments to creditors holding impaired claims.) Courts are generally in agreement, however, that Debtors may avoid the trustee's fee by making payments directly on claims that the debtors will pay according to the original contract terms and on which their payments are current. *See In re Rott,* 73 B.R. 366, 374 (Bankr. D.N.D.1987): *In re Hildebrandt,* 79 B.R. 427, 429 (Bankr. D.Minn.1987); *In re Hagensick,* 73 B.R. 710, 713 (Bankr. N.D. Iowa 1987). In the instant case, however, the Debtors have

not given any creditors unimpaired treatment.[1] Additionally, the plan does not propose that the Debtors will make direct payments to any creditors. Accordingly, the Debtors must pay trustee's fees on not only the payments to Aetna but also on the "contract payments." One court has specifically discussed the necessity of paying trustee's fees on administrative expenses. *See In re Greseth*, 78 B.R. 936, 940–41 (D.Minn.1987). The court in *Greseth* reasoned:

> Section 1222(a)(2) states that a Chapter 12 plan shall 'provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507 of this title....' 11 U.S.C. § 1222(a)(2). Section 507(a)(1) awards administrative expenses top priority for payments from a debtor's assets. 11 U.S.C. § 507(a)(1). The trustee assume the responsibility under Chapter 12 of monitoring payments under the plan. *See* 11 U.S.C. § 1202(b)(4), 1226(c). Further, the trustee is required to pay administrative claims prior to or at the time other creditors are paid under the plan. 11 U.S.C. § 1226(b). This statutory scheme places importance on payment of administrative claims and requires significant attention to those claims by the standing trustee. As such the court finds it proper to require the Debtor to pay the trustee's fee with regard to administrative payments.

*Id.* There is a strong policy consideration that the standing trustee must be paid a reasonable compensation to attract qualified individuals to the job. *Logemann*, 88 B.R. at 941. In light of this consideration and the court's analysis in *Greseth* which demonstrated that payment of administrative expenses is primarily the burden and responsibility of the trustee, this court concludes that trustee's fees must be paid on administrative expenses.

**5.**

■ Aetna objects that the plan does not provide for an adequate interest rate to provide it with the present value of its secured claim as required by section 1225(a)(5)(B)(ii). The plan provides that Aetna's $267,133.00 secured claim will be paid at 10 3/4% interest amortized over 25 years. The first year's payment is a partial payment of $10,380.79 to be paid on December 31, 1988. The annual payment for the subsequent twenty-four years will be $31,142.37. Section 1225(a)(5)(B)(ii) provides that the court shall confirm a plan, with regard to secured claims, if the plan provides that "the value, as of the effective date of the plan, of property to be distributed by ... the debtor under the plan on account of such claim is not less than the allowed amount of such claim." The United States Court of Appeals for the Eighth Circuit has concluded that the appropriate interest rate to provide a creditor with the present value of their claim is the " 'prevailing rate' for a loan with a term equal to the payout period in the particular case, with due consideration to the existence and quality of any security and the risk of subsequent default." *United States v. Neal Pharmacal Co.*, 789 F.2d 1283, 1289 (8th Cir.1986). *See also, In re Monnier Bros.*, 755 F.2d 1336, 1339 (8th Cir.1985). The best evidence of what an appropriate interest rate ought to be is what a similar new loan to a debtor in similar circumstances would cost in the financial marketplace. *In re Claeys*, 81 B.R. 985, 993 (Bankr.D.N.D.1987); *In re Konzak*, 78 B.R. 990, 992 (Bankr.D.N.D.1987); *In re Rott*, 73 B.R. 366, 374 (Bankr. D.N.D.1987).

Aetna introduced the testimony of Michael Hall, an accountant employed with a

---

1. The payment projection contained in the Debtors' plan includes an item designated "contract payments." This is a separate item from the line pertaining to secured creditor payments. The item, "contract payments," apparently refers to payments on claims in Class D, Claims Secured By Personal Property. The treatment of Class D claims is described in sections 7(b)(1) and 7(b)(2) of the plan. These claims appear to be treated in accordance with at least some of the original terms. However, at the beginning of both sections 7(b)(1) and 7(b)(2) appears the statement, "the rights of holders of these secured claims shall be modified as follows: (if no change, write 'no change')." The Debtors have not written "no change" but instead have specified various terms. In light of the introductory language of sections 7(b)(1) and 7(b)(2) the court concludes that these claims are impaired.

Denver mortgage corporation specializing in agricultural loans. Hall testified that in the current market an agricultural loan amortized over twenty-five years carries an interest rate of 11¼% if it has a five-year balloon payment. He noted that the longer the period of time for which an interest rate is fixed, the greater the risk to the bank and consequently the higher the rate of interest required. In Hall's opinion the rate of interest the Rotts would be charged in the open market for a twenty-five year amortization with no balloon payment on agricultural real estate would be 11¾ to 12%.

The Debtors introduced the testimony of Garland Weidrich, a farm consultant and employee of the Union Bank in Halliday, North Dakota. Weidrich testified that in assessing the risk incumbent in a loan, the Union Bank considers the repayability of the loan, which is essentially a function of cash flow; the character of the debtor including his management ability; and, the equity which the Debtor has in the operation. Weidrich testified that the Union Bank would charge the Rotts an interest rate of 10½ to 11% for a twenty-five year amortization with no balloon payment. He admitted, however, that the Union Bank has not recently made any 100% penetration agricultural real estate loans. With regard to the Debtors' management ability, Weidrich observed that it had been poor in the past but their recent attempt at reorganization shows initiative. The Debtors' poor management ability coupled with their third bankruptcy filing leads the court to believe that a potential loan officer would not view their character favorably in a risk analysis. Furthermore, the Debtors' cash flow is very tight and they are proposing a loan in an amount that 100% penetrates the value of the collateral. Weidrich's estimation of an interest rate of 10½ to 11% is overly optimistic. The court concludes that the 11 3/4% interest rate over twenty-five years with no balloon payment advanced by Michael Hall was the appropriate interest rate that should have been used in the plan.

### 6.

■ Aetna also objects to being paid only a partial payment on December 31, 1988, and not receiving a payment including a full year's amortization until December 31, 1989. The court agrees that there is no basis under Chapter 12 for forcing a creditor to accept this type of treatment. After the Debtors have had use of Aetna's collateral for a full year and generated income from a full farming cycle, it would be inequitable to pay Aetna only a partial payment. It may be that a partial payment to Aetna in the first year is necessary for the plan to cash flow. The cash flow requirements of the plan, however, are not a consideration when determining the terms of repayment to secured creditors. The court concludes that the Debtors' plan should have included a provision for making a payment to Aetna covering a full year's amortization in 1988.

### 7.

Aetna also objects to confirmation of the plan on the grounds that it is not feasible. The feasibility requirement of Chapter 12 arises from section 1225(a)(6) which provides that the court shall confirm a plan if "the debtor will be able to make all payments under the plan and to comply with the plan." *In re Konzak*, 78 B.R. 990, 993 (Bankr. D.N.D.1987). This court gives debtors the benefit of the doubt regarding feasibility when the debtor's projections, using reasonable inputs in light of the current economic climate, indicate that it is reasonably probable that the debtors will be able to make the plan payments. *Id.*

In 1988 the Debtors project that they will have income of $113,070.20 and expenses of $80,247.00, including personal living expenses. These projections yield a net income of $32,823.20 available for plan payments. This amount of available income must, however, be adjusted. First the factors that increase the amount available for plan payment will be discussed. The Debtors produced $2,500.00 of income in 1988 by a commodity sales technique known as a PIK and Roll. This income was inadvertently omitted from their 1988 income projection. Another increase to income is produced when the $11,917.00 capital improvement expense is added back to the computation of available income. As discussed above in section 3, debtors may

not build such an undesignated expense into their projections. A final increase in available income is produced by a reduction in the amount which the Debtors must pay to lease a tractor from their son, Robert. Their projections include tractor lease expense of $10,380.00. At the hearing Robert testified that he was willing and able to accept $5,000.00 for tractor rent. In exchange the Debtors plan to provide Robert with approximately $5,380.00 worth of labor.

■ There are also some decreases in the income available for plan payments. The ASCS office in the Debtors' county has mistakenly calculated the Debtors' government farm program payments based upon an irrigated corn yield of 90 bu. per acre rather than the correct dry land corn yield of 51 bu. per acre. This mistake has caused the Debtors to overstate the amount of their government payment by $7,500.00. The projected amount of income the Debtors will receive from their participation in the CRP program must also be adjusted downward. Their projection includes the full amount of the CRP payment. The land enrolled in the program belongs to Robert Rott rather than the Debtors. The CRP contract specifies that Robert will receive 1/3 of the payments. Robert testified that he would give his 1/3 of the payment to his parents. His 1/3 payment, however, could be subject to claims by his own creditors. The court is not inclined to force creditors in the instant case to rely upon Robert's unenforceable gratuitous promise.

The adjustments to the income available for plan payments discussed above may be summarized as follows:

| | | |
|---|---|---|
| Projected Available Income | | $32,823.20 |
| Plus: | | |
| PIK and ROLL Income | $ 2,500.00 | |
| Capital Improvement | 11,917.00 | |
| Tractor Rent Reduction | 5,380.00 | |
| | | 19,797.00 |
| Less | | |
| Government payment reduction | $ 7,500.00 | |
| One-third CRP share | 2,286.80 | |
| | | 9,786.80 |
| Available for 1988 Plan Payments | | $42,833.40 |

At the confirmation hearing Aetna introduced the testimony of Jerry Weaver, a professional farm manager for Agri Affiliates, Inc., a Nebraska farm management firm. Weaver advanced an alternative set of projections which indicated that the Debtors had understated their expenses. He made the calculation for his projections using average expense data contained in a study produced by the North Dakota State University Extension Service. This data reflected the average expenses of production in a ten county area including the Debtors' farm. The Debtors produced their projections using the historical data from their own farming operation. Most of the Debtors' numbers for 1988 are now actual rather than projected. When confronted with a choice between projections reasonably based upon a debtor's historic data, or projections produced from a study including a broader geographic area, the court believes that the more narrowly tailored projections are a better indicator of future performance. Accordingly, in the instant case the court finds the Debtors' expense projections to be more accurate.

■ The plan's ability to cash flow may be analyzed by comparing the income available to the payments required under the plan. That analysis, giving effect to the decisions above regarding interest rate, trustee's fees, and a full year's payment to Aetna in the first year of the plan, is as follows:

| | |
|---|---|
| Income available for 1988 plan payments | $42,833.40 |
| Less: | |
| Annual payment of Aetna's secured claim ($267,133 @ 11.75% over 25 years) | 33,470.07 |
| Administrative expenses | 4,500.00 |
| Contract payments | 3,321.16 |
| Trustee's fees | 4,129.12 |
| Disposable Income | $(2,586.95) |

Using the Debtors' yield, price and expense projections their plan will not cash flow in 1988.

The same type of analysis may be made of the second year of the plan which is typical of the remaining years of the plan's

life. For 1989 the Debtors project income of $112,310.46 [2]; expenses of $75,093.09; and, income available for plan payments of $37,217.37. This figure is subject to the same adjustments discussed above in connection with the 1988 available income, except that there is no adjustment for additional PIK and Roll income since that was a one-time adjustment. Also, the amount of adjustment for capital improvement expense is less because a lesser amount was included in the plan. One additional adjustment must be made for 1989. Aetna asserts that the Debtors will not have enough land available to plant all of the acres of crops which they project planting in 1989. Between the land they intend to retain and the land they intend to rent from their son, they project they will have 1,213.7 available cropable acres. The Debtors plan to use these acres as follows:

| | |
|---|---|
| Wheat | 206.5 acres |
| Corn | 188 |
| Oats | 36 |
| Soybeans | 70 |
| Sunflowers | 230.6 |
| CRP | 172 |
| Set aside acres [3] | 193 |
| Total | 1,186.1 |

The Debtors have neglected, however, to account for 71 acres which they currently have enrolled in the government water bank program. The water bank program requires farmers to set aside land for ten years as a conservation practice. The last year that the Debtors' land is enrolled in the water bank program is 1988. At the hearing when confronted with the insufficient acreage available for their projected crop plan Arlon Rott testified that all but approximately 12 acres of the water bank land is tillable. He proposed to till the land and use it for ACR set aside acres rather than re-enrolling it in the water bank program. The court finds, however, that the land would not be eligible for use as set aside acres unless it had been planted with a government farm program crop for two of the preceding three years. Further-

more, the Debtors' projections do not include any expenses associated with tilling this additional 71 acres. Accordingly, the land is not realistically available for the Debtors' 1989 cropping plan. When these 71 acres are added to the 1,186.1 acres which the Debtors plan to plant, it totals 1,257.1 acres. This is 43.4 acres more than the Debtors have available. In the Debtors' projections the non-program crop which yields the least revenue per acre is oats [4], the next least is soybeans. When the projected revenue from the Debtors' 36 acres of oats and 7.4 of their projected soybean acres are deleted, the projected income available for plan payments must be reduced by $2,832.57. This amount can be set off by the $1,438.00 which the Debtors will receive in 1989 if they re-enroll the land in the water bank program. Thus, the net reduction in available income caused by the Debtors' over projection of cropable acres is $1,394.57.

The adjustments and the cash flow of the plan in 1989 may be summarized as follows:

| | | |
|---|---|---|
| Projected Available Income | | $37,217.37 |
| Plus: | | |
| Capital Improvement | $ 5,763.09 | |
| Tractor Rent Reduction | 5,380.00 | |
| | | 11,143.09 |
| Less: | | |
| Government Payment Reduction | $ 7,500.00 | |
| One-third CRP Share | 2,286.80 | |
| Overestimation of Cropable Acres | 1,394.57 | |
| | | 11,181.37 |
| Available for 1989 Plan Payments | | $37,179.09 |
| Less: | | |
| Annual Payment of Aetna's Sec. Claim ($267,133 @ 11.75% over 25 years) | $33,470.07 | |
| Contract Payments | 1,211.16 | |
| Trustee's Fees | 3,468.12 | |
| | | 38,149.35 |
| Disposable Income | | $ (970.26) |

2. After adjusting for typographic error and resulting computational error in the Debtors' wheat income calculation.

3. This is the number of set aside acres required only for the Debtors participation in the wheat

and corn government program. They do not intend to participate in the oat program.

4. There is a government program for oats but the Debtors determined that it is more lucrative to sell oats outside of the program.

Thus, the plan would not cash flow in 1989. The court concludes that the Debtors' plan does not meet the feasibility requirement of section 1225(a)(6).

Accordingly, for the reasons stated, the Debtors' First Amended Plan of Reorganization is denied confirmation.

SO ORDERED.