In re E.I. PARKS NO. 1 LIMITED PARTNERSHIP,
Debtor-in-possession.

Bankruptcy No. FA 88–261M.

United States Bankruptcy Court,
W.D. Arkansas,
Fayetteville Division.

Oct. 19, 1990.

Katherine Gay, Fayetteville, Ark., for objecting creditors.

Michael Reif, Little Rock, Ark., for debtor.

Jim Hollis, Little Rock, Ark., Asst. U.S. Trustee.

## ORDER

JAMES G. MIXON, Bankruptcy Judge.

On August 10, 1988, E.I. Parks No. 1 Limited Partnership (debtor) filed a voluntary petition for relief under the provisions of chapter 11 of the United States Bankruptcy Code. A confirmation hearing on the first proposed plan of reorganization was held on July 13 and 14, 1989, and confirmation was denied. The debtor filed an amended proposed plan of reorganization on August 7, 1989. A confirmation hearing on the amended plan was held on October 12 and 13, 1989, and the case was taken under advisement.

The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), and the Court has jurisdiction to enter a final judgment in the case.

The debtor owns and operates two mobile home parks: Northern Hills (Northern Hills Park), located in Springdale, Arkansas, and Western Hills (Western Hills Park), located in Fayetteville, Arkansas. At the first confirmation hearing, the Court determined the market value of Northern Hills Park to be $700,000.00, and the market value of Western Hills Park to be $740,000.00. The parties did not dispute these values at the second confirmation hearing.

The amended plan (plan) contains six classes of creditors. Class one contains the claim of Shady Grove Associates (Shady Grove); class two contains the claim of Western Hills Venture (Western Hills); class three contains the claim of Walter V. Grimes (Grimes); class four contains the claims of the unsecured creditors; class five contains all claims of interest of the limited partners; and class six contains the claim of M.C. Brooks or Executive Investors, Inc. The claim of class three is treated as unimpaired; all other classes are impaired. Four of the six classes voted on the plan. Classes one and two voted to

reject the plan, and classes four and five voted to accept the plan.

Shady Grove and Western Hills object to the debtor's amended plan [1] because (1) the plan does not propose to pay the market rate of interest on Shady Grove's and Western Hills' secured claims, and (2) the plan is not feasible and thus fails to comply with 11 U.S.C. § 1129(a)(11).[2]

## CLAIM OF SHADY GROVE

Shady Grove's claim is stated in the plan to be "approximately $700,000.00" and the value of its collateral, Northern Hills Park, has been determined to be $700,000.00; therefore, Shady Grove holds a fully secured claim in the amount of $700,000.00. *See* 11 U.S.C. § 506(a). The plan proposes the following treatment of Shady Grove's secured claim:

> The Class One Claim is impaired. Shady Grove Associates is a Creditor with a secured claim of approximately $700,-000.00. This secured claim is based upon the Northern Hills note....
>
> ....
>
> In order to fully satisfy Shady Grove Associates' claim based on the Northern Hills Note, the Debtor will modify the Northern Hills Note. The Northern Hills Note will be modified to have a principal amount equal to the value of Northern Hills, which was previously determined by the Court to be $700,000.00 and will be a recourse Note. The Modified Northern Hills Note will be amortized over a thirty (30) year period, due and payable in ten (10) years. Principal and interest will be paid in monthly installments.
>
> Unless the Court orders that another interest rate be applied, the Modified Northern Hills Note shall bear interest at a rate equal to the rate on thirty (30) year government securities as published in the *Wall Street Journal* on the first business day following the Effective Date of the Plan plus two percent (2%) as a risk factor; provided, however, unless otherwise agreed by Debtor or ordered by the Court, said interest rate shall not exceed ten and one-half percent (10.5%). No default shall be deemed to have occurred under this Plan if the required payments are made within forty-five (45) days after the due date of each payment. The Modified Northern Hills Note shall be fully assumable. Shady Grove Associates shall retain all valid liens until its claim is satisfied in full. The remainder of the balance of the Northern Hills Note shall be discharged and satisfied by the issuance of a Modified Limited Partnership Interest to Shady Grove Associates equal to four percent (4%) of all Modified Limited Partnership Interests issued pursuant to the Plan. The Debtor will reaffirm the Shady Grove Mortgage on the Effective Date of the Plan and Shady Grove will retain all rights under the Mortgage except as modified by the Plan.

Shady Grove objects to the plan because the interest rate proposed to be paid does not allow Shady Grove to receive the present value of its secured claim.

■ The treatment of a secured claim of a creditor that votes to reject a plan is governed by the cramdown provisions found in 11 U.S.C. § 1129(b)(2)(A)(i)(II). This section provides in relevant part that a plan may be confirmed over the objection of a secured creditor if:

> each holder of a claim of such class receive[s] on account of such [secured] claim deferred cash payments totaling at

---

**1.** Shady Grove and Western Hills also filed a motion to dismiss the debtor's chapter 11 case for failure to comply with this Court's order entered on December 2, 1988, nunc pro tunc to September 30, 1988. The order, which set forth certain conditions for the debtor's use of cash collateral, required the debtor to file a plan by November 29, 1988, and have the plan confirmed by January 30, 1989. The debtor submitted a plan in compliance with the order, and this Court's order denying confirmation of that plan superseded the other requirements of the December 2, 1988, order.

**2.** In their objections to confirmation filed on October 4, 1989, Shady Grove and Western Hills raised several other objections to the debtor's plan; however, at the confirmation hearing, the objecting creditors addressed only the issues of interest rate and feasibility.

least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property[.]

If, as here, the plan proposes to pay a secured creditor in installments, the present value of the future stream of payments must equal the amount of the creditor's secured claim. *See In re Shannon,* 100 B.R. 913, 926–27 (Bankr.S.D.Ohio 1989) (construing the identical language in § 1129(b)(2)(A)(i)(II)).

■ The phrase "present value" is described in *Collier on Bankruptcy* as:

a term of art for an almost self evident proposition: a dollar in hand today is worth more than a dollar to be received a day, a month or a year hence. Part of the "present value" concept may be expressed by a corollary proposition: a dollar in hand today is worth exactly the same as (1) a dollar to be received a day, a month or a year hence plus (2) the rate of interest which the dollar would earn if invested at an appropriate interest rate.

5 *Collier on Bankruptcy* ¶ 1129.03[4][F][i] (15th ed. 1990). For the present value of the future stream of payments to equal the amount of the secured claim, interest at an appropriate discount rate must be added to the payments.

Many courts, including the Eighth Circuit Court of Appeals, have approved the following guidelines for determining the appropriate rate:

The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration for the quality of the security and the risk of subsequent default.

5 *Collier on Bankruptcy* ¶ 1129.03[4][F][i], at 1129–85. *See United States v. Doud,* 869 F.2d 1144, 1146 (8th Cir.1989); *United States v. Neal Pharmacal Co.,* 789 F.2d 1283, 1285 (8th Cir.1986); *Prudential Ins. Co. v. Monnier (In re Monnier Bros.),* 755

F.2d 1336, 1339 (8th Cir.1985); *United States v. Camino Real Landscape Maint. Contractors, Inc. (In re Camino Real Landscape Maint. Contractors, Inc.),* 818 F.2d 1503, 1505 (9th Cir.1987).

Although it is clear that the discount rate should reflect the "prevailing market rate of interest," determining how that rate should be calculated is not so clear. *See* Carbiener, *Present Value in Bankruptcy: The Search for an Appropriate Cramdown Discount Rate,* 32 S.D.L.Rev. 42 (1987). The complexity stems, in part, from the fact that the market rate of interest can refer to more than one market, e.g., the rate paid to an investor or the rate charged by a commercial lender. An infinite variety of factors influence what parties to a transaction may agree is the market rate of interest.

In three different cases, the Eighth Circuit Court of Appeals has considered how to determine the appropriate market rate of interest, but the Court has not adopted a specific method. In the first case, *Prudential Ins. Co. v. Monnier (In re Monnier Bros.),* 755 F.2d 1336 (8th Cir.1985), the Court of Appeals approved the prepetition contract rate as the appropriate market rate of interest. The Court of Appeals observed that the contract rate had been established by the parties only twenty months before the plan was confirmed; the contract had a payout term equal to the plan; and the contract involved identical security. *Id.* at 1339. The Court of Appeals indicated that the determination of the appropriate market rate of interest was factual stating, "[l]acking any evidence correlating other rates with the 'coerced loan' contemplated by the plan, the district court did not err in reinstating the contract rate of interest." *Id.*

In the second case, *United States v. Neal Pharmacal Co.,* 789 F.2d 1283 (8th Cir.1986), the Eighth Circuit Court of Appeals did not approve a specific market rate of interest but disapproved an interest rate based solely on the creditor's cost of borrowing money. The Court of Appeals observed that other factors to be considered in arriving at the appropriate market rate

of interest included: the length of the payment period, the existence of collateral, and the risk of nonpayment. *Id.* at 1286.

In the third and most recent decision, *United States v. Doud*, 869 F.2d 1144 (8th Cir.1989), the Eighth Circuit Court of Appeals approved a market rate of interest based on the yield for treasury bonds, plus a 2% upward adjustment to account for the overall risk involved. In *Doud*, the Court of Appeals noted that *Monnier Bros.* set a "broader standard relating to components of an appropriate interest rate, which should consist of a risk-free rate, plus additional interest to compensate a creditor for risks posed by the plan." *Id.* at 1146. The Court of Appeals emphasized that determination of the proper market rate of interest in a particular case is a factual inquiry and can only be determined after consideration is given to all the elements involved in computing the appropriate interest rate. *Id.*

Both the debtor and the objecting creditors cite the Eighth Circuit Court of Appeals cases as support for their positions. Shady Grove argues that the market rate of interest should be determined based upon a hypothetical coerced loan by a commercial lender to the debtor, citing *Neal Pharmacal*, 789 F.2d at 1285–86, and *Monnier Bros.*, 755 F.2d at 1338–40. Several bankruptcy courts in the Eighth Circuit have adopted this approach. *See In re Schaal*, 93 B.R. 644, 647 (Bankr.W.D.Ark. 1988); *In re Rott*, 94 B.R. 163, 168 (Bankr. D.N.D.1988); *In re Citrowske*, 72 B.R. 613, 617 (Bankr.D.Minn.1987); *In re Claeys*, 81 B.R. 985, 993 (Bankr.D.N.D.1987); *In re Konzak*, 78 B.R. 990, 992 (Bankr.D.N.D. 1987). *See also Monnier Bros.*, 755 F.2d at 1339; *United States v. Southern States Motor Inns, Inc. (In re Southern States Motor Inns, Inc.)*, 709 F.2d 647, 652 n. 7 (11th Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984); *In re*

*Shannon*, 100 B.R. 913, 938–39 (S.D.Ohio 1989).

Shady Grove offered the expert testimony of Donald Robert Tuller, a banker with twenty-seven years of experience, in support of this argument. Tuller testified that his bank would not loan anyone a 100% loan on a thirty-year amortization payable in ten years. He said that if his bank had to make a coerced loan, the best rate and best terms his bank would offer would be a fifteen-year loan at 12% per annum with annual adjustments to the interest rate to account for market fluctuations.[3] He also stated that the 12% rate anticipated a 3% to 4% "spread" for profit and overhead expense. He said that he considers loans secured by mobile home parks to be high risk loans.

■ Utilizing a hypothetical coerced loan as a governing analogy overlooks some important dissimilarities to the chapter 11 cramdown process. For example, the hypothetical coerced loan necessarily includes a factor for profit, a factor most courts have rejected for purposes of calculating the market rate of interest to be applied in a bankruptcy case. *See* Carbiener, *supra*, at 60; *In re Mitchell*, 39 B.R. 696, 701–02 (Bankr.D.Or.1984); *In re Fisher*, 29 B.R. 542, 545 (Bankr.D.Kan.1983). In addition, many lenders would decline to make any loan secured by collateral equal to 100% of the amount of the loan, especially to a debtor in chapter 11. When asked what rate they would charge for a hypothetical coerced loan, lenders invariably state that the rate charged would be the maximum allowed by law. Calculating the market rate of interest solely from the viewpoint of a coerced loan tends to jeopardize the success of a chapter 11 plan and defeat the rehabilitative purposes of bankruptcy reorganization.

The context in which the market rate of interest is to be applied is not a typical

---

**3.** The Eighth Circuit Court of Appeals rejected the use of a variable rate of interest in *United States v. Neal Pharmacal Co.*, 789 F.2d 1283, 1286 (8th Cir.1986). In its analysis of this issue the Court of Appeals stated that the language of the Bankruptcy Code "contemplates the use of a fixed interest rate" in requiring that the present value be determined "as of the effective date of the plan." *Id.* The Court of Appeals further stated that "the use of a floating interest rate would be administratively difficult and would complicate a determination of the feasibility of the debtor's reorganization plan, a prerequisite for confirmation." *Id.*

arms' length loan transaction; the context is the confirmation process of a chapter 11 case under section 1129(b). The purpose of arriving at the market rate of interest in this context is to insure that the plan "compensate[s] for present value and insure[s] the safety of the principal." *Monnier Bros.*, 755 F.2d at 1339 (quoting with approval from *In re American Mariner Indus.*, 734 F.2d 426, 433 (9th Cir.1984)). Since many of the factors relevant to a chapter 11 cramdown are significantly different from the factors that would determine the market rate of interest in a loan transaction, whether coerced or at arms' length, calculating the market rate of interest solely from the viewpoint of a hypothetical coerced lender is inappropriate.

The debtor argues that the appropriate market rate should be calculated by selecting a risk-free rate based on government securities and adding a risk factor. This method has been specifically approved by the Eighth Circuit Court of Appeals in *Doud.* Several bankruptcy courts within the Eighth Circuit have adopted this approach. *See In re Milleson*, 83 B.R. 696, 698–99 (Bankr.D.Neb.1988) (cost of funds to creditor plus 3.5% risk factor); *In re Underwood*, 87 B.R. 594, 600–01 (Bankr.D. Neb.1988) (treasury bill rate plus 4½% risk factor); *In re Simmons*, 86 B.R. 160, 162 (Bankr.S.D.Iowa 1988); *In re Moore*, 81 B.R. 513, 515–16 (Bankr.S.D.Iowa 1988) (treasury bond rate plus 2.5% risk factor); *Federal Land Bank v. Bartlesmeyer (In re Bartlesmeyer)*, 78 B.R. 975, 977 (Bankr. W.D.Mo.1987) (treasury bond rate plus 1% risk factor); *In re Noe*, 76 B.R. 675, 678–79 (Bankr.N.D.Iowa 1987) (government securities plus 2% risk factor); *In re Wichmann*, 77 B.R. 718, 720–22 (Bankr.D.Neb.1987) (treasury bond rate plus 2% risk factor); *In re Wolf*, 61 B.R. 1010, 1012 (Bankr.N.D. Iowa 1986) (rate based on rate of return on investment).

The Eighth Circuit Court of Appeals stated that the elements to be considered in arriving at the appropriate market rate of interest include the term of the payout period, the quality of the security and the risk of subsequent default. *Monnier Bros.*, 755 F.2d at 1339. The debtor offered evidence which touched on each of these factors through the expert testimony of Michael Pyron. Pyron testified that he had reviewed the plan and observed that the interest rate proposed to be paid to Shady Grove was based on a thirty-year government security, plus a 2% risk factor. Pyron explained that a total rate of return on capital is based on a basic safe rate plus a premium to compensate for risk. He noted that, as of the confirmation hearing date, the rate of return for one-year CDs was 8.08%, for ten-year treasuries was 8.16% and for Merrill Lynch asset funds was 8.63%. He said that the September 1989 rate of return for short-term government treasuries was 8.31% and for long-term treasuries was 8.41%. He testified that for October 11, 1989, the day before the confirmation hearing, the rate for a thirty-year treasury bond was 8.04%. Pyron concluded that an appropriate risk-free rate was 8.1% to 8.3% for real estate such as that involved here.

Pyron then noted the quality of the security and analyzed the risk factors involved with the debtor. He noted as positive risk factors that: the collateral is real property located in an area with a strong economic base, the neighborhood has active new construction and residential properties, the property values in the area are appreciating, and employment opportunities are available nearby for the residents. The negative factors he noted included: the slope of the property, the flood zone problems, the "degeneration" of the pool, and lower than anticipated occupancy levels. Pyron concluded that an appropriate risk factor, considering the above elements, was 2%, resulting in an appropriate market rate of interest of 10.1% to 10.3%.

Other factors support Pyron's calculation of the risk factor percentage in this particular case. The length of the plan payout is only ten years and is the same period to which the parties agreed in the prepetition note. Although no equity cushion currently exists, the claim is presently fully secured and the collateral consists of valuable real estate which is likely to appreciate in value. Shady Grove's secured status,

therefore, is not likely to deteriorate significantly over any portion of the payout period of the plan even if payments under a confirmed plan are not made. The debtor's operating expenses have made it difficult for the debtor to make debt service payments and this problem is compounded by the lack of working capital necessary to make needed capital improvements. The quality of the debtor's management is not as good as it could be because of antipathy between the debtor's general partners and management. However, if the debtor defaults in any proposed plan payment on debt service, the creditor has available its state law remedies of foreclosure. Based on the evidence presented in this case, the creditor's risk of loss upon default does not appear to be exceptionally high.

The Court agrees with the debtor's calculation of the market rate of interest using a risk-free rate plus a risk factor. The debtor's plan proposes a maximum interest rate of 10.5% to be paid on the secured claim of Shady Grove, and the debtor has calculated its cash flow projections based on a 10.5% interest rate.[4] Under the facts in this case, 10.5% constitutes the appropriate market rate of interest to be applied to the payments on Shady Grove's secured claim.

### CLAIM OF WESTERN HILLS

[6] The debtor's plan proposes the following treatment of Western Hills' claim:

The Class Two Claim is impaired. Western Hills Venture is a Secured Creditor with a claim of approximately $992,-400.00. This secured claim is based upon the Western Hills Note....

. . . .

The security for the Western Hills Note is a second mortgage on Western Hills Mobile Home Park ("Western Hills Mortgage") which "wraps around" the prior mortgage given by Western Hills Venture to Grimes. The Western Hills Venture also assigned its rights and obligations in the Escrow Instructions by

way of the Assignment to the Debtor. The Escrow Instructions function as a security agreement by specifying an amount which must be paid to release a given item of personal property. The personal property consists of the Escrowed Mobile Homes. The titles to the Escrowed Mobile Homes are held by the Escrow Agent pursuant to instructions and are released to the Debtor upon the payment of the "pay to release" amount.

The principal balance outstanding on the Western Hills Note as of the Filing Date is $992,000.00.

In order to satisfy Western Hills Venture's Claim based on the Western Hills Note, the Debtor will modify the Western Hills Note. Western Hills Venture currently has an obligation to Grimes pursuant to the terms of the Grimes Note. As stated previously the Western Hills Note is a wrap note around the Grimes Note. The Debtor will assume Western Hills Venture's obligations under the Grimes Note and make the payments directly to Grimes. In addition, the Debtor will execute a Modified Western Hills Note for the difference or the principal balance of the Grimes Note and the value of the Western Hills Note. Both Grimes and Western Hills will have the right of recourse against the Debtor in the event of default.

The present balance of the Grimes Note is approximately $741,305.00. The collateral for the Western Hills Note has been determined by the Court to have a value of $740,000.00. If there is any difference between the value of Western Hills and the principal balance of the Grimes Note, the Debtor will execute a Modified Western Hills Note for the difference. The Modified Western Hills Note shall be payable in monthly installments of principal and interest based on a thirty (30) year amortization rate and will mature in ten (10) years.

Unless the Court orders that another interest rate be applied the Modified

---

**4.** The minimum interest rate acceptable would be a risk-free rate keyed to the payout term proposed for the secured claim, plus a risk factor, which would vary according to the facts of a particular case. The 10.5% rate proposed by this debtor would provide interest to Shady Grove at the rate for 10–year government securities, plus a 2.34% risk factor.

Western Hills Note shall bear interest at a rate equal to the rate on a thirty (30) year government securities as published in the *Wall Street Journal* on the first business day following the Effective Date of the Plan plus two percent (2%) as a risk factor; provided, however, unless otherwise agreed by Debtor or ordered by the Court, said interest rate shall not exceed ten and one-half percent (10.5%). No default shall be deemed to have occurred under this Plan if the required payments are made within forty-five (45) days after the due date of each payment. The Note shall be fully assumable. Western Hills Venture shall retain all valid liens until its claim is satisfied in full.

The Debtor will assume all existing terms of the Grimes Note and will make payments consistent with the terms. The approximately [sic] principal balance of the Grimes Note is $741,305.00 and is payable in monthly installments of principal and interest. The original principal balance of the Grimes Note was $825,000.00 and was executed in 1987. The Grimes Note was amortized over a twenty five (25) year period with interest to accrue at the rate of nine and one-half percent (9.5%) per annum. The Debtor will also assume all the terms of the Escrow Agreement. Grimes will have full recourse against the Debtor in the event of default. Grimes will retain its interest in Western Hills pursuant to the Grimes Mortgage.

The remainder of the balance of the Western Hills Note shall be discharged and satisfied by the issuance of Modified Limited Partnership Interests to Western Hills Associates equal to 11% of all Modified Limited Partnership Interests issued pursuant to the Plan.

The value of the collateral securing Western Hills' claim has been determined to be $740,000.00, and, according to the debtor's plan, the amount of Western Hills' prepetition claim is "approximately $992,400.00." The Western Hills mortgage is subject to a first mortgage in favor of Grimes securing a claim with a balance of $688,638.74 as of September 18, 1989. The Western Hills mortgage is a "wrap around" mortgage, that is, Western Hills is obligated to make the payments due to Grimes from the payments Western Hills receives from the debtor. Because the equity above the mortgage to Grimes is $51,361.26, Western Hills holds a secured claim for that amount only. *See* 11 U.S.C. § 506. Therefore, the cramdown requirements of 11 U.S.C. § 1129(b)(2)(A)(i)(I) and (II) only apply to $51,361.26 of Western Hills' claim. The evidence established that the risk factors applicable to Western Hills' claim were essentially the same as the risk factors regarding Shady Grove's claim. Therefore, the appropriate market rate of interest for Western Hills' secured claim is determined to be 10.5% for the reasons previously stated in regard to Shady Grove's claim.

■ The balance of Western Hills' claim is unsecured and cannot be placed in the same class as Western Hills' secured claim. Only claims which are substantially similar may be placed in the same class. 11 U.S.C. § 1122(a). Secured claims are not substantially similar to unsecured claims. *See In re Citrowske,* 72 B.R. 613, 616 (Bankr.D. Minn.1987); 5 *Collier on Bankruptcy* ¶ 1122.03[1][b] (15th ed. 1990).

■ The treatment of Western Hills' unsecured claim is governed by the provisions of subsection (ii) of 11 U.S.C. § 1129(b)(2)(B). This subsection sets forth the "absolute priority rule," which provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under a reorganization plan. *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). The holders of ownership interests in a chapter 11 debtor can retain their ownership interests in the reorganized company without violating the absolute priority rule only if they contribute property to the debtor equal to or exceeding the value of the interest retained. *Official Creditors' Comm. v. Potter Material Serv. (In re Potter Material Serv.),* 781 F.2d 99, 101 (7th Cir.1986); *Case v. Los Angeles Lum-*

*ber Products Co.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939).[5]

In this case, paragraph 4.5 of the debtor's plan provides:

The Class Five Claims are impaired. These interests are the Limited Partners interests. Those Limited Partners electing to participate in a recapitalization of the Debtor pursuant to the terms of this Plan shall have their existing Limited Partnership Interests modified and readjusted to reflect a pro rata ownership of 85% of the Modified Limited Partnership Interests based on their pro rata share of the recapitalization. Those Limited Partners who do not participate in the recapitalization of the Debtor shall have their Limited Partnership Interests cancelled as of the Effective Date.

The debtor's plan proposes that the value to be contributed by the limited partners equals the value of the interests retained by the limited partners, and the creditors offered no evidence to the contrary. The plan also proposes that the objecting creditors are to receive additional property in the form of an equity interest in the reorganized debtor. Whether the combination of these two factors satisfies the absolute priority rule must be determined in the context of a modified plan if an objection is made.

## OTHER PLAN PROVISIONS

■ In addition to any objection raised by creditors, the Court has a mandatory duty to determine whether a plan meets all the requirements necessary for confirmation. *In re Baugh,* 73 B.R. 414, 416 (Bankr.E.D.Ark.1987). Other plan provisions, although not addressed by these creditors, must be amended before the plan can be confirmed.

■ First, the treatment of Western Hills' claims in the last paragraph of the plan is unreasonably vague. The plan states that the "remainder of the balance of the Western Hills Note shall be discharged and satisfied by the issuance of Modified Limited Partnership Interests." The plan uses the words "discharged" and "satisfied" as if they were synonymous; however, these words describe opposite events in a chapter 11 case. If a discharge of any portion of Western Hills' note is contemplated, that means that the plan proposes no payment of the discharged portion of the debt. If the debt is satisfied under the plan, then the type of payment contemplated must be either in money or by the transfer of other valuable property. The treatment of Western Hills' claim must be made clear.

■ Second, the plan proposes to convey limited partnership interests to both Shady Grove and Western Hills "in exchange for the cancellation of the debt" to Shady Grove and Western Hills. This provision is vague because the plan states in other provisions that all of Shady Grove's and Western Hills' claims are to be paid in installments of money. Any plan provision regarding the transfer of limited partnership interests and payment of money to any creditor must be specific as to the amount being paid in money and the amount of the creditors' claims being paid by the transfer of the partnership interest.

## FEASIBILITY

■ The Court has approved the debtor's 10.5% interest rate used in its cash flow analysis and, since curing the plan's other defects will not affect the calculations used by the debtor, feasibility of the plan can be determined.

■ 11 U.S.C. § 1129(a)(11) provides that a plan cannot be confirmed unless confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." To be feasible, a chapter 11 plan must offer a reasonable prospect of success and be workable. *United Properties, Inc. v. Emporium Dep't Stores, Inc.,* 379 F.2d 55, 64 (8th Cir.1967). Success need not be guaranteed. *Monnier Bros.,* 755 F.2d at 1341.

The test is whether the provisions of the plan which are to be accomplished after

---

**5.** *But see Ahlers,* 485 U.S. at 203–04 n. 3, 108 S.Ct. at 967 n. 3.

confirmation can be done as a practical matter under the facts. *Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson),* 767 F.2d 417, 420 (8th Cir.1985) (quoting *In re Bergman,* 585 F.2d 1171, 1179 (2d Cir. 1978)). Pertinent factors to be considered include the business' earning power, the sufficiency of the capital structure, economic conditions, managerial efficiency and whether the same management will continue to operate the business. *Clarkson,* 767 F.2d at 420.

Conflicting testimony was presented regarding the debtor's probability of success under the proposed plan. Nevertheless, the testimony indicated that the debtor, although narrowly making its debt service payments in 1989, possesses the probability of increased earning potential in the second year of the plan. The debtor's plan calls for significant recapitalization by the limited partners, which, once implemented, would enable the debtor to improve the mobile home parks, thus attracting more occupants and increasing the debtor's revenues. The testimony indicated that the debtor was restructuring its management scheme to decrease operating costs and improve efficiency. Additionally, the debtor's plan proposes the maintenance of an escrow account to ensure that the debt service payments are made to Shady Grove and Western Hills. The possibility of nonperformance is present in all chapter 11 cases; however, the debtor has proposed a feasible plan.

## CONCLUSION

Shady Grove's and Western Hills' objections to confirmation are, therefore, overruled in part and sustained in part. The debtor has twenty days to file a modified plan consistent with this order. If no objections to the third amended proposed plan are filed within the time permitted by law, the plan will be confirmed without further notice. If objections are filed, a hearing will be set by subsequent notice.

IT IS SO ORDERED.