**In re VALUE RECREATION, INC., Debtor.**

**Bankruptcy No. 97–36779.**

United States Bankruptcy Court, D. Minnesota, Third Division.

Jan. 20, 1999.

Arthur C. Benson, Minneapolis, MN, for Debtor.

## ORDER

DENNIS D. O'BRIEN, Chief Judge.

Hearing was held on November 20, 1998, on confirmation of Debtor Value Recreation's Second Modified Plan of Reorganization. Northland Credit Corporation, the Debtor's major prepetition lender, objects to confirmation. Appearances were as noted in the record. Based on the evidence presented and received at the hearing; on the briefs and arguments of counsel; and being fully advised in the matter; the Court now makes this ORDER pursuant to the Federal and Local Rules of Bankruptcy Procedure.

### I.

### THE DEBTOR AND THE PLAN

Value Recreation, Inc. has been in the business of selling gymnasium and playground equipment since 1988, mostly to schools and school districts. In recent years, the company has expanded its business, concentrating on sales in connection with new facilities. According to the Debtor, its major supplier in this endeavor, Performance Sports Systems, defaulted on several projects leaving Value Recreation with losses of $300,000, and causing this bankruptcy filing. The petition was filed October 14, 1997.

The Debtor's Chapter 11 plan is premised on reorganization of the business to concentrate on sales to clients with existing facilities, rather than in connection with new construction. According to the Debtor, the change will reduce both the gross receipts and disbursements of the business, improving net cash flow. During the first seven months of the bankruptcy case, Value Recreation experienced a net cash flow of $2,856.80, on receipts of $426,613.08 and dis-

bursements of $423,274.28. For the first six months under the restructured business, the Debtor projected gross receipts of $244,000 and disbursements of $219,500, resulting in a net cash flow of $24,500.[1]

This is not a large case. The Debtor's scheduled debt is:

**secured**

| | |
|---|---|
| Northland Credit Corporation | $ 50,000 |
| Robert Janohosky | $ 36,000 |
| Chanhassen Bank | $ 11,000 |
| Imperial Capital Corp. | $ 5,000 |

**priority**

| | |
|---|---|
| Internal Revenue | $ 24,167 |
| Mn. Dept. Revenue | $ 5,653 |

**unsecured** [2]        $454,816

The plan provides for monthly payments to secured and priority creditors of $2,730, and quarterly payments to unsecured creditors of $4,704. Assuming the Debtor's cash flow projections are accurate, Value Recreation should have a net cash flow average of approximately $4,100 a month, and should have the ability to fund the plan as proposed.

All classes, other than Northland Credit, have accepted the plan. The plan proposes to pay Northland $50,000 over five years in monthly installment payments including 12% annual interest. Northland objects, contending that: the allowable amount of Northland's secured claim, as of the hearing, was $71,406; the proposed interest rate would not pay Northland the present value of its claim; the plan is not feasible; and, the plan violates the absolute priority rule.[3]

### II.

### NORTHLAND'S CLAIM

*The Note*

In June 1996, Value Recreation obtained a capitalization loan from Northland in the form of a note evidencing a $100,000 line of

---

1. The period covers August 1998 through January 1999. At hearing, William Janohosky, the Debtor's principal, provided scant testimony regarding actual results through November.

2. This includes a scheduled disputed claim of Performance Sports Systems in the amount of $132,402.

3. The plan provides for cancellation of pre bankruptcy shareholder interests and for William Janohosky, a prepetition shareholder, to purchase new stock of the Debtor for $5,000.

credit at 3% interest per month, or 36% annual interest. The parties disagree on what their intention was in the transaction. The Debtor claims that the interest rate was supposed to be one and one-half percent per month, or 18% annual interest for a loan of indefinite duration. Northland claims that the 3% monthly interest rate was clearly understood by the parties, and that the loan was intended as a bridging loan pending the Debtor's qualification for more favorable financing elsewhere. Northland's principal testified that Northland assisted Value Recreation in attempting to secure permanent financing, but the effort was not successful.

Whatever the intention, the Debtor executed a demand promissory note in the amount of $100,000 at 3% per month on June 20, 1996. Value Recreation drew $50,000 of the line of credit the following day.[4] The loan is secured by all of the Debtor's assets, which consist of inventory, accounts receivable, bank accounts, and miscellaneous personal property and equipment.

The Debtor made interest payments for each of the months prior to bankruptcy following execution of the note, but not always timely. Value Recreation continued to make the full interest payments postpetition for the months of October, November and December 1997. No January 1998 payment was made, but payments were resumed in February and continued monthly in the amount of $500 each through the hearing on confirmation.

### The Stipulation

On April 28, 1998, Value Recreation and Northland entered into a stipulation for use of cash collateral, which provided the basis for an order approving the Debtor's use of cash collateral entered on May 6. The agreement called for payments of $500 per month to Northland for adequate protection of its secured claim. Additionally, paragraph 2 of the stipulation read:

4. According to William Janohosky, the note was executed and the draw was made only because Value Recreation had issued checks in the amount of $50,000 before the Debtor learned that the note provided for 36% rather than 18%.

5. The note provides for interest to be compounded monthly. Northland's principal testified that

2. As of the date hereof, Northland is the holder of a secured claim against the Debtor in the amount of $50,000 as evidenced by a Promissory Note dated June 20, 1996 (the "Note") which Note requires monthly payments of $1,500 from the Debtor.

Value Recreation represented in the stipulation that Northland's collateral had the following present values: inventory $1,000; accounts receivable $124,460; and, bank accounts $16,804.

One month later, Value Recreation filed its first Disclosure Statement and Plan, which recognized Northland's secured claim at $50,-000 and provided for payment to be amortized over five years at 12% annual interest. Northland's objection followed.

### Allowable Amount Of The Secured Claim

Northland computed the amount of its claim by running a computer program that automatically compounds interest and applies payments. The claim is based on interest compounded daily due to untimely pre bankruptcy payments; and, due to the failed payment for January 1998 and the less than full interest payments made pursuant to the cash collateral payments.[5] Northland also added two separate charges for attorney's fees, one on December 24, 1997, in the amount of $819.51; and the other on October 31, 1998, in the amount of $1,183.53. Total mount claimed is $71,406.93.

Value Recreation argues that Northland is bound by its cash collateral stipulation that the amount of the claim as of April 28, 1998, was $50,000. The Debtor also asserts that, by agreeing to the $500.00 per month adequate protection payments in the stipulation, Northland waived its rights to the 3% contract interest rate. Alternatively, The Debtor requests disallowance of any additional interest to the secured claim on equitable grounds.

the interest was actually compounded daily when payments were not timely made. The note does not require that payments be made on any particular day or at any particular time. Interest accruing on $50,000 at 3% for one month is $1,500.00

11 U.S.C. § 506(b) entitles an oversecured creditor to interest at the contract rate during pendency of a bankruptcy case prior to confirmation of a plan. *Prudential Insurance Company Of America v. Monnier (In re Monnier Brothers)*, 755 F.2d 1336, 1338 (8th Cir.1985): *(Since the Prudential loan was accelerated and oversecured, Prudential had a right at the date the plan became effective to the unpaid principal plus any contract rate interest that had accrued up until that time).* Acceptance of payments, in the form of adequate protection, that are less than bargained for interest payments under the contract of the parties does not constitute a waiver by the creditor of bargained for interest at the contract rate. *Southland Corporation v. Toronto–Dominion*, 160 F.3d 1054 (5th Cir.1998). Adequate protection payments are intended to preserve the bargained for position of the creditor regarding the collateral at filing; the payments are not intended to replace the bargained for position. Northland has always been oversecured, and is entitled to interest on the claim at the contract rate during pendency of the case pre confirmation.[6]

However, the computation begins on a stipulated claim of $50,000 as of April 28, 1998, with adjustments for subsequent adequate protection payments of $500 per month. With interest compounded monthly, after adjustments for the $500 monthly adequate protection payments, the claim as of December 1, 1998, before application of attorney's fees, was approximately $57,662.[7] With the October 31, 1998 attorney's fee charge of $1,183.53 added, the total secured claim as of December 1, 1998, was approximately $58,845. The Debtor's plan is not confirmable because it does not provide for payment of the full amount of the allowable claim of Northland Credit Corporation.

*Present Value*

11 U.S.C. § 1129(b)(2)(A) provides that, where a secured class has rejected a proposed plan, the plan can be confirmed if:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

The provision requires that the plan pay the "present value" of the secured claim.

Northland asserts that the Debtor has not shown that 12% is a "commercially reasonable rate" for a similar loan to a similarly situated borrower who has not filed for bankruptcy; and, that in fact the plan would result in payment of less than present value of the allowed amount of Northland's secured claim.

The Debtor's expert witness testified that interest rates for financially troubled borrowers were, at the time of the hearing, 3 to 5% above the prime rate, which was 7.75%; while rates for untroubled borrowers ranged from 9 to 10½%, on five-year loans. Based on this information, the expert opined that the 12% rate provided for Northland under the plan was a "commercially reasonable rate." On cross examination, the expert conceded that because of the Debtor's history, balance sheet, and particularly because of the Debtor's debt to equity ratio, Value Recreation could not likely obtain a commercial loan at 12% or at any rate. Northland's principal testified later that he searched for a

---

6. The Debtor's request for interest abatement on equitable grounds is based on *Vanston v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946). That case was pre Bankruptcy Code, and cannot provide authority for the exercise of equitable power that would compromise Northland's statutory rights.

7. The computation that produced this amount did not prorate interest for the last two days of April, but simply ran the numbers on 7 successive monthly periods including the months of May through November 1998.

third party lender for the Debtor, and was only able to find availability of a factoring loan at 2½% per month.

■ None of this testimony is probative of the appropriate interest rate to provide payment to Northland of the present value of its secured claim. "Present value" is:

> [not] a legal concept, but rather it is a term of art in the financial community. It simply means that a dollar received today is worth more than a dollar to be received in the future. To compensate the creditor for not receiving its money today, the debtor is charged an additional amount of money. The charge is based on a rate of interest called a "discount rate." The discount rate is used to calculate how much the creditor should be paid so it will have the same amount of money in the future as it would have had if it did not have to wait to be paid.

*In re Fisher*, 29 B.R. 542, 543 (Bankr. D.Kan.1983).

Present value in the bankruptcy environment, however, does not include profit. *In re Fisher*, at 546; *In re E.I. Parks No. 1 Limited Partnership*, 122 B.R. 549, 554 (Bankr.W.D.Ark.1990). *See also:* C. Frank Carbiener, *Present Value in Bankruptcy: The Search For An Appropriate Cramdown Discount Rate*, 32 S.D. L.Rev. 42 (1987). It is not a subjective measure of what return the particular creditor might be able to obtain on the money if the claim were to be satisfied now. Present value of a claim is an objective measure, without regard for who the creditor is, or what particular investment markets and strategies the creditor might make use of to maximize return on investment.

■ Present value of a claim is best arrived at by starting with the rate for a risk free investment for a term similar to the proposed loan. *In re Kellogg Square Partnership*, 160 B.R. 343, (Bankr.D.Minn.1993). That rate is then enhanced to reflect the risk that the claim might not be satisfied.[8]

> In general...the binding Eighth Circuit precedent requires the proponent of the plan to identify a rate of interest that could be earned on a risk-free investment, such as that currently paid on a United States treasury bond of like term, and then to augment that rate by an increment that is sufficient to compensate the secured creditor for the risk it will bear over the term of the reamortization, as a result of the reorganized debtor's retention of the possession of the collateral. *United States v. Doud*, 869 F.2d at 1146; *In re Monnier Bros.*, 755 F.2d at 1339. *See also In re Hardzog*, 901 F.2d 858, 860 (10th Cir.1990) (recognizing Doud as applying just this methodology).

*In re Kellogg Square* at 363.

If it could be said that there exists no risk of the claim going unsatisfied, then the present value would be the present return on a risk free investment of a similar term with no enhancement.[9]

■ Appropriate considerations in evaluating the risk are: nature and value of the collateral; financial ability of the reorganized debtor to make the payments; and, term of the obligation. But, whether a debtor would qualify for a similar loan, or any loan, in the marketplace is, by itself, not determinative of whether the proposed treatment would pay present value of the creditor's claim. *In re Kellogg Square* at 364. Whether a debtor is presently creditworthy in the marketplace, is at best only marginally related to the prospect that an existing claim against the debtor will not be satisfied in the future. It is the risk of the claim going unsatisfied that is the

---

8. Present value is not properly based on rates commercially available to similarly situated borrowers for similar loans because those rates include enhancements to risk free investments in addition to risk, most notably profit. The prime rate itself contains the enhancement of profit; and, in fact, certain borrowers can obtain loans from certain lenders at rates below the prime rate that are also profit enhanced. *In re Fisher*, 29 B.R. 542, 548 (Bankr.D.Kan.1983); See also: C. Frank Carbiener, *Present Value in Bankruptcy:*

*The Search For An Appropriate Cramdown Discount Rate*, 32 S.D. L.Rev. 42 (1987).

9. Significantly, the precise risk evaluated is the risk of failure of satisfaction of the claim, or the risk of loss on default; not simply the risk of default. See: *Present Value in Bankruptcy: The Search For An Appropriate Cramdown Discount Rate*, C. Frank Carbiener, 32 S.D. L.Rev. 42, 61 (1987).

appropriate focus in determining its preset value, once the risk free rate has been identified.

■ Much of the risk analysis is performed in considering whether the plan is feasible. But, a finding of feasibility does not eliminate risk of the claim going unsatisfied. Feasibility is not a guarantee of success.

> To be feasible, a chapter 11 plan must offer a reasonable prospect of success and be workable. *United Properties, Inc. v. Emporium Dep't Stores, Inc.*, 379 F.2d 55, 64 (8th Cir.1967). Success need not be guaranteed. *Monnier Bros.*, 755 F.2d at 1341.
>
> *In re E.I. Parks No. 1 Limited Partnership*, 122 B.R. 549, 559 (Bankr.W.D.Ark. 1990).

Nonetheless, this Court is not aware of any reported decision of a court in the Eighth Circuit in which a court has accepted a risk enhancement of more than 4½% where a proposed plan has been found feasible.

■ Applying this discussion to the present value issue in this case results in an interest rate substantially lower than 12%, as of the November hearing, assuming a finding of feasibility. A risk free investment that provides the basis for addition of an appropriate risk enhancement to arrive at present value, is the then current rate for 5 year Treasury Bills. The most recent reported rate as of the hearing was an October 16, 1998, rate of 4.04%.

The allowable secured claim of Northland, as of December 1, 1998, was approximately $58,845. Value of the collateral was more than double the allowable claim. But, the collateral consists mainly of accounts receivable and cash. Accounts receivable have remained relatively constant during pendency of the case at approximately $120,000, of which more than $90,000 have remained less than 90 days old. Cash has ranged from $20,000 to $40,000; and, at hearing the Debtor had an additional $17,000 credit in paid deposits to suppliers on current projects.

These are all highly fluid current assets. Cash can be depleted quickly. The nature,

amount, and value of accounts receivable can also quickly erode. But, adequate safeguards can be provided Northland through standard lending provisions setting default triggering minimum values for current receivables, cash or combinations; and, through default triggering provisions for reasonable reporting and monitoring requirements.[10] Assuming these provisions, and assuming a feasible plan, a risk factor of 5% should reflect present value of Northland's claim as of the November 20, 1998, confirmation hearing. When added to the risk free basis of 4.04% for 5 year Treasury Bills, the resulting appropriate interest rate reflecting the present value of Northland's claim, as of the hearing, was 9.04%.

## III.

### FEASIBILITY

■ A number of factors are considered in the Eighth Circuit in determining feasibility.

> The test is whether the provisions of the plan which are to be accomplished after confirmation can be done as a practical matter under the facts. *Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir.1985) (*quoting In re Bergman*, 585 F.2d 1171, 1179 (2d Cir. 1978)). Pertinent factors to be considered include the business' earning power, the sufficiency of the capital structure, economic conditions, managerial efficiency and whether the same management will continue to operate the business. *Clarkson*, 767 F.2d at 420.
>
> *In re E.I. Parks No. 1 Limited Partnership*, 122 B.R. 549, 559 (Bankr.W.D.Ark. 1990).

Value Recreation provided little testimony and no documentation regarding the actual performance of the Debtor during the period August through November 1998. Performance during the first seven months of the case prior to the restructuring of business focus provided a net cash flow of $2,856.80, far short of what would be needed to fund

---

**10.** Northland is entitled to these protections in receiving the "indubitable equivalence" of its

claim. *In re Kellogg Square*, 160 B.R. 343 at 368 (Bankr.D.Minn.1993).

the Debtor's plan. For the year prior to bankruptcy, the Debtor suffered negative cash flow. Documentation and review of actual performance for the period August through November 1998, under the restructured business, was critical in assessing feasibility of the plan. The necessary evidence is lacking in the record. Feasibility has not been shown.

## IV.

### ABSOLUTE PRIORITY RULE

■ The absolute priority rule prevents junior interests in a bankruptcy case from receiving property at the expense of senior interests who are not being paid in full the allowed amounts of their claims. The rule has its roots in application of the Bankruptcy Act, prior to the adoption of the Bankruptcy Code of 1978. See generally, *In re Lumber Exchange Limited Partnership,* 125 B.R. 1000 (Bankr.D.Minn.1991). The Bankruptcy Code of 1978 codified the rule in 11 U.S.C. § 1129(b)(2). Thus, § 1129(b)(2)(A) requires, as a condition of confirmation, that the holders of secured claims, in a class that has not accepted the plan, be paid the full present value of the allowed amounts of their claims. The holders of claims in unsecured rejecting classes need not be paid in full; but, if the holders of claims in an unsecured rejecting class are not paid in full, the plan is confirmable only if:

> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B).

The Debtor's plan provides for a prepetition shareholder, William Janohosky, to retain the post bankruptcy equity in Value Recreation for payment of $5,000 cash. Northland claims that the Debtor has not shown that the plan's provision satisfies the absolute priority rule.[11]

Consideration of the absolute priority rule, as a separate test of confirmation, is appropriate only with respect to the holders of claims that can be paid less than the full allowed amounts of their claims under a proposed plan. The rule has no separate application to Northland because Northland is not the holder of such a claim. With respect to Northland, the rule is satisfied through application of § 1129(b)(2)(A). The plan either: provides for payment in full at present value the allowed amount of Northland's secured claim pursuant to 11 U.S.C. § 1129(b)(2)(A); or, the plan is not confirmable under that section. If the plan provides for full payment of its secured claim at present value, Northland receives all that it is entitled to; and, no junior interest could receive property at the expense of Northland. If the plan does not provide for payment in full at present value, confirmation is denied on that basis, and no separate "absolute priority" inquiry is reached. Northland has no unsecured claim in the case, and has no standing to raise the issue.[12]

## V.

### DISPOSITION

Confirmation of the Debtor's plan must be denied because the plan does not provide for payment of the full allowable amount of

---

**11.** It has been held in the Eighth Circuit that prepetition equity holders can retain the equity in a reorganized debtor without violating the absolute priority rule as to the holders of unsecured claims in a rejecting class that are not paid in full. *In re E.I. Parks No. 1 Limited Partnership,* 122 B.R. 549, 558 (Bankr.W.D.Ark.1990) *(holders of ownership interests in a chapter 11 debtor can retain their ownership interests in the reorganized company without violating the absolute priority rule only if they contribute property to the debtor equal to or exceeding the value of the interest retained.) See, however, In re Lumber Exchange Limited Partnership,* 125 B.R. 1000 (Bankr.D.Minn.1991), holding that the "new val-

ue" exception to the absolute priority rule does not exist under the Bankruptcy Code. Northland argues that the Debtor failed to show that the $5,000 price reflects reasonable value for the equity.

**12.** The Debtor's unsecured class voted to accept the plan. Northland argues for extension of the absolute priority rule, beyond the existing provisions of 11 U.S.C. § 1129(b)(2)(A), to apply in favor of secured classes. Despite considerable discussion of the matter during closing arguments, the rationale for the proposal remains unclear to the Court.

Northland Credit Corporation's claim; and, because the Debtor has not shown that the plan is feasible.

Based on the forgoing, it is hereby **ORDERED**: confirmation of Value Recreation's Second Modified Plan of Reorganization is denied.